**UNITED STATES of America,
Plaintiff,**

**v.**

**Walter L. LACHMAN, Maurice H. Subilia, Jr., Fiber Materials Inc., Materials International, Defendants.**

**No. CR. 93–10193–DPW.**

United States District Court,
D. Massachusetts.

Aug. 14, 2003.

See also 48 F.3d 586.

James D. Herbert, Despena F. Billings, United States Attorney's Office, Boston, MA, for Plaintiff.

Alan M. Dershowitz, Cambridge, MA, Harold J. Friedman, Babcock & Gaythwaite, Portland, ME, Martha C. Gaywaite, Friedman, Gaythwaite, Wolf, & Leavitt, Portland, MN, Andrew Good, Silverglate & Good, Michael R. Schneider, Salsberg & Schneider, Harvey A. Silverglate, Silverglate & Good, Bruce A. Singal, Donoghue, Barrett & Singal, PC, Boston, MA, for Defendants.

### MEMORANDUM AND ORDER REGARDING JUDGMENTS OF ACQUITTAL

[Originally issued under seal on July 18, 2003 as Docket No. 534]

WOODLOCK, District Judge.

## TABLE OF CONTENTS

I. BACKGROUND ...... 70
  A. *General Regulatory Structure of Export Controls* ...... 70
  B. *Proof at Trial* ...... 73
  C. *Jury Instructions Concerning the Meaning of "Specially Designed"* ...... 74
    1. *The Dhir and Webb pre-trial affidavits* ...... 74
    2. *The jury instructions* ...... 77
  D. *Defendants' Post–Trial Motions* ...... 78

II. ANALYTICAL FRAMEWORK ...... 79

III. DEFENDANTS' POST–TRIAL SUBMISSIONS ...... 80
  A. *Evidence Going to the Commerce Department's Interpretation of the Term "Specially Designed"* ...... 80
    1. *Statements made by the U.S. delegation at COCOM meetings* ...... 80
    2. *Public statements by Commerce Department officials* ...... 82
    3. *Affidavits of former Commerce Department officials* ...... 82
  B. *Evidence Concerning the History of the Term "Specially Designed"* ...... 84
    1. *COCOM custom and usage* ...... 84
    2. *Prior use of the term "specially fabricated"* ...... 85
    3. *History of the 1991 revision of the MTCR Annex* ...... 86

IV. THE GOVERNMENT'S RESPONSE ...... 87

V.   ANALYSIS .............................................89
    A.   *Indeterminacy and the Operative Regulatory Language* .....................89
    B.   *Void for Vagueness Doctrine* ...........................................91
        1.   *Fair notice* ......................................................91
        2.   *Fair enforcement* ................................................94
    C.   *Reprehensibility and Criminality* ......................................97

VI.   CONCLUSION ...........................................98

\*    \*    \*    \*    \*    \*

I have found this case—as an intellectual matter—the most troubling criminal proceeding over which I have presided in nearly seventeen years as a trial judge. This is principally because, while I view the defendants' conduct as reprehensible in the most fundamental sense, I must conclude that their fundamentally reprehensible conduct was not in violation of the federal criminal law with which they were charged.

The case arose out of the export by the defendants of industrial equipment to India. That equipment, the government contends, was "specially designed" so that it could have an end use in connection with ballistic missile components having a nuclear capability. It has become evident as a result of unfolding discovery attendant to post-trial proceedings that in administering the operative language in the export regulatory scheme upon which the criminal proceeding was premised, the government provided alternative definitions to the critical phrase "specially designed." These definitions were sufficiently variable that intelligent persons confronting the language could not be certain of its meaning.

While I employed a "plain meaning" definition for the phrase when instructing the jury, the products of post-trial proceedings establish that this "plain meaning" provided not the only—or even the most common—definition employed by the government for the phrase in this regulatory scheme at the time of the conduct at issue. Indeterminacy to the meaning of the critical language is offensive to due process because it fails to provide the notice necessary to enable the affected population to identify what conduct is prohibited and thereby invites arbitrary and discriminatory enforcement. On the basis of what I have now come to know, following laborious post-trial proceedings in litigation subject to the constraints of the Classified Information Procedures Act, 18 U.S.C.App. 3, §§ 1–16, I have concluded that I am required to grant defendants' motion for judgment notwithstanding the verdict.

## I.   BACKGROUND

### A.   *General Regulatory Structure of Export Controls*

■ A detailed description of the regulatory structure involved in this case is necessary to give an appropriate context to the issues.[1]

---

1.  A separate motion to vacate the verdict or for new trial was filed by new post-trial counsel for the defendant Lachman on grounds that no inquiry was made under Fed. R.Crim.P. 44(c) regarding his joint representation—with the defendants Fiber Materials, Inc. and Materials International—by trial counsel from the firm of Foley, Hoag & Eliot.

I permitted post-trial discovery on the issues, including depositions. Examining this claim, particularly with the benefit of the Supreme Court's recent guidance in *Mickens v. Taylor*, 535 U.S. 162, 122 S.Ct. 1237, 1245, 152 L.Ed.2d 291 (2002), I find the motion to be without merit. *Mickens* held that, in order to establish a Sixth Amendment violation arising

In furtherance of its plenary authority to regulate trade, Congress has vested various government bodies with the power to monitor and control the flow of certain commodities from the United States, as a means for protecting national security and executing foreign policy objectives. As a sort of catchall, the Export Administration Act of 1979 (the "Export Act"), 50 U.S.C.App. § 2401 *et seq.* (1988),[2] gave the Commerce Department authority over the export of all commodities and technology not subject to the specialized regulatory schemes of other government agencies or departments. Accordingly, the Commerce Department—and more particularly, its Bureau of Export Administration ("BXA")[3]—exercised export authority over the vast majority of goods exported from this country. Much of the complexity in this regime is driven by items that have a dual use—items that have both a commercial and military application.

Implementation of the Export Act is carried out through the Export Administration Regulations (the "Export Regulations"), which set out a complex set of definitions, guidelines, and licensing requirements and restrictions.[4] To facilitate a uniform licensing scheme, the Commerce Department uses a licensing system that examines the destination of each good and classifies the item based on its general nature or capabilities. This system relies heavily on a commerce control list (the "Control List"),[5] which classifies commodities subject to the Commerce Depart-

from a failure by the trial court to make inquiry about a potential conflict of interest, a defendant must demonstrate trial counsel's alleged conflict of interest adversely affected his performance. None of the jointly represented defendants makes such a showing. At most, the claim appears to be an expression of disappointment with the adverse result following their informed and intentional choice of strategy. As a practical matter, Lachman, Fiber Materials, Inc. and Materials International were, despite their status as separate juridical entities, all under the common control of Lachman himself. Lachman was 97% owner of Fiber Materials, Inc. and Materials International was a wholly owned subsidiary of Fiber Materials, Inc. Lachman fully exercised the power of control over the corporate entities. His strategic decision, after counsel raised the possibility of blaming the companies as a defense for him, was to reject taking adverse positions between himself and either of his companies. The choice of a unified strategy, after what appears from the post-verdict record to have been informed discussions adequate to consider the issues, resulted in a formal resolution by the corporate entities to retain Foley, Hoag & Eliot as counsel for all three defendants. Based upon my familiarity with the course of proceedings, the conduct of the trial and the post-verdict proceedings, I am satisfied that counsel from Foley, Hoag & Eliot informed, honored and implemented their clients' strategic choices with a high degree of professionalism. I will, consequently,—despite my allowance of the motion (Doc. No. 300) for judgment of acquittal—expressly deny the new trial motion (Doc. No. 318) raising 44(c) grounds.

2.   Except where noted, the regulatory regime described in this Memorandum is as it existed in 1988, when the transactions at issue took place.

3.   In April 2002, the Department of Commerce changed the name of the Bureau of Export Administration to the Bureau of Industry and Security. 67 Fed.Reg. 20630 (Apr. 26, 2002).

4.   The Export Act was not permanent legislation and expired in 1994. Following its expiration, the provisions of the Export Act and the Export Regulations have been maintained by presidential order under the International Emergency Economic Powers Act. Exec. Order No. 12924, 59 Fed.Reg. 43437 (1994); 67 Fed.Reg. 53721 (Aug. 14, 2002). Thus, the criminal penalties applicable to offenses committed before the lapse of the Export Act remain in force. 59 Fed.Reg. 43437 § 2.

5.   Known, as of 1988 and until 1991, as the Commodity Control List and thereafter as the Commerce Control List. *See* 56 Fed.Reg. 42824, 42824 (Aug. 29, 1991). *See generally* Note 9 *infra.*

ment's export controls. 15 C.F.R. § 399.1, Supp. 1 (1988) (now 15 C.F.R. § 774, Supp. 1 (2003)). The Control List system entails a five-character Export Control Classification Number ("ECCN") for each item included on the list. Each ECCN indicates the good covered, the functions, characteristics, or specifications of that particular good and the export licensing requirements involved. *Id.*

Matching an item to its appropriate ECCN is an exporter's first step in the licensing process. With certain exceptions, "the export from the United States of all commodities" is prohibited "unless and until a general license authorizing such export shall have been established or a validated license or other authorization for such export shall have been granted[.]" 15 C.F.R. § 370.3(a) (1988). General licenses exist as a standing matter: if the export of a good requires neither an application nor a document, then a general license attaches automatically.[6] By contrast, a validated license, which authorizes the export of goods not covered by any of the general licenses, must be applied for by the exporter.[7] Thus, the system depends on a substantial amount of self-policing.

At the same time, if an exporter is unsure whether its proposed export item requires a validated license, there are some avenues for clarification. Under practice in place in 1988, and continuing through the present, *see generally* 15 C.F.R. § 748.3 (2003), the exporter can request a commodity classification determination, or can apply for an advisory opinion. For advisory opinions, the BXA required information not only on the item to be export-

ed, but the final destination, end-use and end-user. The BXA could then issue a non-binding advice letter stating whether a license is required. Both the commodity classification determination and the advisory opinions were confidential given the proprietary nature of the disclosures.

The regulatory structure of export controls is guided and defined not only by domestic bodies. Acting together with allies who shared the same export objectives, the United States formed the Coordinating Committee on Multilateral Export Controls ("COCOM") in the early 1950s. *See* Peter Swan, *A Road Map to Understanding Export Controls: National Security in a Changing Global Environment,* 30 Am. Bus. L.J. 607, 619 & n. 85 (1993). COCOM's purpose was to "establish and maintain a system of export controls designed to curtail or eliminate the availability of strategic technology to nations deemed potentially hostile." *Id.* Working together, the members of COCOM

> compile[d] a list of goods and technologies considered to be either militarily sensitive or to have dual-use capabilities.... Each member nation then incorporated this list of controlled commodities and information ... into its respective export control regime, thereby ensuring consistent export treatment of strategic goods by Western allies.

*Id.* Commodity classifications transposed from a COCOM list were identified by the code letter "A" on the Commerce Department's Control List. *See* Note 9 *infra. See generally* John F. McKenzie, *Implementation of the Core List of Export Controls:*

---

**6.** To correct the misnomer of "general license," the term was replaced with "license exception" in 1996. Cecil Hunt, *Coping With U.S. Export Controls—Department of Commerce Export Controls,* Practicing L. Inst., (Dec.1999).

**7.** Despite the breadth of statutory authority to control exports, the percentage of exports requiring a validated license is small.

*Computer and Software Controls,* 5 Software L.J. 1 (1992).[8]

### B. *Proof at Trial*

As a matter of factfinding, the focus of the prosecution in this case was on the defendants' export of a hot isostatic press ("HIP") and accompanying control panel to the Indian government in April 1988. A HIP is a piece of industrial equipment that subjects material being processed within its internal cavity to extreme high heat and pressure. The dynamic of this heat and pressure combination results in the "densification" of the processed material, as a result of which the material generally will have increased thermal conductivity, strength, and resistance to fatigue. When exposed to this process, carbon/carbon material, in particular, becomes suitable for use in rocket components, including ballistic missiles with nuclear capability.

As of April 1988, the Control List item covering isostatic presses, ECCN 1312A,[9] required a validated license both for HIPs with an internal cavity diameter of 5 inches or more, as well as for, *inter alia,* any "components, accessories and controls" that were "specially designed . . . therefor." 15 C.F.R. § 399.1, Supp. 1 (1988). The HIP shipped by the defendants to the Indian government had a cavity diameter of 4.9 inches, and thus did not require a validated license. However, the control panel shipped along with it had "controllers" not just for the two "heating zones" featured by the 4.9 inch HIP, but for five heating zones altogether, as would be expected for a larger HIP. (A switch on

---

8. COCOM ceased to exist in March 1994. 59 Fed.Reg. 15621 (Apr. 4, 1994). Former CO-COM nations agreed to set up another multilateral regime, but until that regime was in place, COCOM members agreed to continue controls on the "most sensitive items and arms as these have been [identified] in the COCOM lists." *See* Bradley K. Steinbrecher, *The Impact of the Clinton Administration's Export Promotion Plan on U.S. Exports of Computers and High–Technology Equipment,* 15 U. Pa. J. Int'l Bus. L. 675 (1995). In July 1996 the United States and 32 other countries gave approval to the establishment of a new multilateral export control regime called the Wassenaar Arrangement on Export Controls for Conventional Arms and Dual–Use Goods and Technologies. *See* http://www.wassenaar.org. Under the Wassenaar Arrangement, participating members are to notify each other of the decision to transfer or deny transfer of any item contained in the Arrangement's List of Dual–Use Goods and Technologies and its Munitions List. *See* http://www.wassenaar.org/docs/IE96.html.

The Wassenaar Arrangement has been criticized for being a "much weaker entity" than COCOM:

Unlike COCOM, Wassenaar members do not have veto power over one another's exports, do not have an agreed-upon list of embargoed or restricted countries, and do not have a requirement for notification of exports prior to shipment. The Wassenaar Arrangement merely requires an aggregate summary notification of listed exports after transfer takes place, and a notice of a license denial.

Christopher F. Corr, *The Wall Still Stands! Complying with Export Controls on Technology Transfers in the Post–Cold War, Post–9/11 Era,* 25 Houston J. Int'l L. 441, 455 (2003); *see also* Jamil Jaffer, *Strengthening the Wassenaar Export Control Regime,* 3 Chi. J. Int'l L. 519 (2002).

9. Under the revised version of the Control List currently in effect, the item covering isostatic presses is now listed as ECCN 2B004.

In August 1991, BXA published a completely restructured and renumbered Commerce Control List, replacing the Commodity Control List, to provide some continuity between its list and the International Industrial List, which COCOM had developed in 1990. 56 Fed.Reg. 42824, 42824 (Aug. 29, 1991). As part of this change, item 1312A was changed to 2B04A. 56 Fed.Reg. at 42909. In 1996, as part of a larger overhaul of the Export Administration Regulations, BXA again reformatted the ECCN numbers. The presses that were once associated with number 1312A were reclassified as 2B004. 61 Fed.Reg. 12714, 13036 (Mar. 25, 1996).

the control panel permitted temporary disabling of three of its five heating zone controllers, so that the control panel could safely operate the 4.9 inch HIP.) On the theory that the control panel thus was "specially designed" for a HIP that would have required a validated license—even if actually shipped with a HIP that did not—the government charged the defendants with criminal violation of the Export Act and its implementing regulations for exporting the control panel without a validated license.

At trial, the defendants relied on two principal contentions: First, they claimed that ECCN 1312A did not contemplate control panels as a whole, but only the individual component controls situated on those panels. Second, they asserted that the control panel at issue was designed, built and tested to be used only with the 4.9 inch HIP, nothing else.

The jury effectively rejected both contentions, convicting the defendants of having intentionally, and in violation of a known legal duty, exported a commodity covered by the Control List without a validated license. In particular, the jury appears to have rejected the defendants' second argument in light of evidence that: (i) the 4.9 inch HIP could not accommodate five heating zones without ruining the structural integrity of the vessel; (ii) the switch that permitted the disabling of three of the control panel's five heating zone controllers was purchased for a "HIP control panel" before the control panel in question was built; and (iii) the defendants entered into a contract with the Indian government in March 1988 to have a large HIP that would have been covered by the Control List—and which featured five heating zones—manufactured by a third party in Switzerland and shipped directly to India from there.

### C. *Jury Instructions Concerning the Meaning of "Specially Designed"*

As a matter of law, the jury's determination was fundamentally premised on a crucial ruling I initially made pre-trial and continued to use in jury instructions defining the operative term "specially designed." This was a term which appeared throughout the Control List as it existed in 1988, but was not separately defined. In order to develop a definition for trial, I directed the government to submit documentation that might shed further light on the term's meaning.

#### 1. *The Dhir and Webb pre-trial affidavits*

In response, the government submitted the affidavits of two Commerce Department officials, Surendra K. Dhir and Bruce C. Webb. Dhir, for seven years, including 1988, the Director of the Capital Goods Technology Center of the BXA's Office of Technology and Policy Analysis,[10] asserted that, drawing on custom and usage in the COCOM context, the Commerce Department interpreted the term "specially designed" as used in ECCN 1312A to encom-

---

**10.** In April 1988, and until reorganization of the BXA in 1994, the BXA's Office of Export Licensing was organized by technical category, so that license applications for capital goods (like HIPs) were processed by the Capital Goods Branch. (Other branches included the Electronic Components Branch and the Computer Systems Branch.) To resolve technical questions, the licensing officers in the Office of Export Licensing branches would coordinate with engineers in the analogous divisions (called "centers") of the BXA's Office of Technology and Policy Analysis. Thus, the Director of the Capital Goods Technology Center of the BXA's Office of Technology and Policy Analysis would have principal responsibility for determining such questions as whether a given component, accessory, or control was "specially designed" for a HIP covered under ECCN 1312A. Beiter Aff., Doc. No. 510, Ex. C, ¶ 6; Hunt letter, Govt's 9/24/97 filing (not docketed).

pass components, accessories and controls with "properties or design features that would *enable them to be used for* [covered HIPs]" (emphasis added).[11] Dhir Aff., Doc. No. 121, Ex. B, ¶ 7. Dhir added that, for a component, accessory or control to be deemed "specially designed" for a covered HIP under ECCN 1312A, it was not necessary that the part have "no other function or use except in connection with" the covered HIP. *Id.* In particular, to the extent that a control panel capable of operating a covered HIP might also be capable, when set to function at a lower capacity, of operating a smaller, non-covered HIP, Dhir stated that a validated license would remain necessary unless the prospective exporter "permanently disable[s] the excess capacity of the control panel, . . . so that the control panel is incapable of being used at its originally designed capacity." *Id.,* ¶ 9.

Webb, for eight years, including 1988, an Industrial Analyst/Senior Staff Engineer with the BXA's Office of Technology and Policy Analysis, asserted that the Commerce Department's interpretation of "specially designed" as used in ECCN 1312A was drawn from custom and usage in the COCOM context, and that the Commerce Department consistently had been of the view that the terminology's coverage was not limited to components, accessories or controls "designed for an exclusive purpose." Webb Aff., Doc. No. 121, Ex. A, ¶ 6. Rather, Webb contended, "specially designed" in this context was understood by the Commerce Department to refer more broadly to "properties or design features that would enable [a component, accessory or control] to be used for certain predetermined purposes." *Id.*

Webb added that this meaning was not contradicted by the "exclusive use" definition of "specially designed" appended in 1991 to the list of items covered under the Missile Technology Control Regime ("MTCR"). The MTCR is a multilateral regime established in 1987 to prevent the transfer of complete missile systems and related dual-use equipment and technology. *Id.,* ¶ 7. MTCR requirements are set forth in a published set of "Guidelines for Sensitive Missile–Related Transfers" ("MTCR Guidelines"); covered missile-related items are listed in an attached "Equipment and Technology Annex" ("MTCR Annex"). *Id.,* ¶ 8. Consistent with the specialized nature of this regime, the MTCR Annex covers only a very limited set of the items that appear on the Control List. *Id.* For items that are covered under both the Control List and the MTCR Annex, the United States (as a MTCR member country) is required in its export licensing decisions to consider the criteria set forth under the MTCR Guidelines in addition to those set forth under the relevant ECCN. *Id.,* ¶ 9.

A number of the items listed under the MTCR Annex use the term "specially designed" to describe the scope of the item. *Id.,* ¶ 16. Prior to 1991, the term was left undefined. *Id.,* ¶ 16; *see* Webb Aff., Doc. 121, Ex. A2. As part of the 1991 revision of the MTCR Annex, however, a definition for "specially designed" was added to the document. This definition read (and still reads[12]):

> *"Specially Designed"* describes equipment, parts, components or "software" which, as a result of "development,"

11. For purposes of clarity and consistency, I will employ the word "covered" throughout this Memorandum, rather than the word "controlled," to indicate coverage under a Control List item.

12. *See* http://www.mtcr.info/english/annex.html.

have unique properties that distinguish them for certain predetermined purposes. For example, a piece of equipment that is "specially designed" for use in a missile will only be considered so if it has no other function or use. Similarly, a piece of manufacturing equipment that is "specially designed" to produce a certain type of component will only be considered such if it is not capable of producing other types of components.

MTCR, Equipment and Technology Annex, (Nov. 4, 1991) (emphasis added), Webb Aff., Doc. 121, Ex. A3; *see* Webb Aff., *id.* Ex. A, ¶ 18.

As a past participant both in discussions that led to the 1991 revision of the MTCR Annex, as well as in other negotiations concerning the regime, Webb contended that this "exclusive use" definition of "specially designed" was a new one, and was not meant to reflect past custom and usage in either the COCOM or MTCR contexts. *Id.*, ¶¶ 17, 18, 20. In further support of this view, Webb made three points. First, while acknowledging that the MTCR definition of "specially designed" was eventually included in a list of defined terms supplemental to the Control List (pursuant to the Control List's own 1991 revision), Webb noted (a) that the revised Control List's recitation of the definition was followed by the parenthetical reference "MTCR Context," and further (b) that *no* occurrence of the language "specially designed" elsewhere in the Control List appeared in quotation marks (as conventionally indicates a defined term). *Id.*, ¶¶ 22–23. Thus, Webb suggested that the Commerce Department did not treat the MTCR definition of "specially designed" as even *affecting* custom and usage in the COCOM context, much less *reflecting* it.

Webb also contended that there was a rational need for a narrower meaning to "specially designed" in the MTCR context,

in order to focus precisely application of the MTCR Guidelines on commodities directly related to missile systems. *Id.*, ¶ 17.

Finally, Webb noted that a MTCR item sharing some degree of overlap with ECCN 1312A, MTCR Item 7(c)-Category II, had originally covered "Equipment and process controls ... *specially designed* for densification and pyrolysis of structural composite rocket nozzles and reentry vehicle nose tips," Webb Aff., Doc. No. 121, Ex. A2, at 7; *see* Webb Aff., *id.*, Ex. A, ¶ 15, but was amended, as part of the 1991 revision of the MTCR Annex, to cover "Equipment and process controls ... *designed or modified* for densification and pyrolysis of structural composite rocket nozzles and reentry vehicle nose tips." Webb Aff., Doc. No. 121, Ex. A3; *see* Webb Aff., *id.*, Ex. A, ¶ 19. The 1991 revision of the MTCR Annex introduced the following definition for the term "designed or modified":

> *"Designed or Modified"* describes equipment, parts, components or software which, as a result of "development," or modification, have specified properties that make them fit for a particular application. "Designed or Modified" equipment, parts, components or software can be used for other applications. For example, a titanium coated pump designed for a missile may be used with corrosive fluids other than propellants.

MTCR, Equipment and Technology Annex, (Nov. 4, 1991) (emphasis added), Webb Aff., Doc. No. 121, Ex. A3, at 7; *see* Webb Aff., *id.*, Ex. A, ¶ 19. Contending that MTCR Item 7(c)-Category II was amended so as to retain its original scope, Webb concluded that this definition of "designed or modified" ought to be read as reflecting the MTCR meaning of "specially designed" prior to 1991. Webb Aff., Doc.

No. 121, Ex. A, ¶ 19. Webb did not, however, suggest that this definition of "designed or modified" reflected the COCOM meaning of "specially designed" at any point in time.

## 2. *The jury instructions*

In reliance upon the Dhir and Webb pre-trial affidavits regarding the Commerce Department's understanding of the meaning of "specially designed" as used in ECCN 1312A (which I concluded was consistent with a plain meaning definition of the term), and in the absence of any then compelling contrary evidence on this point, I rejected the defendants' proposal for a jury instruction that would define "specially designed" for purposes of this case to cover the defendants' control panel only if it was "designed exclusively for" a covered HIP, and "had no other function or use." Instead, I informed the parties that I would adopt a construction of "specially designed" that I expressed in my jury instructions as follows:

> You should consider that an item or a commodity is specially designed within the meaning of the regulation if it is designed for a special purpose. In making such an evaluation, you should consider whether [the defendants' control panel] has properties or design features that would enable it effectively to be used for certain predetermined purposes—in this case, as a control for [a HIP covered under ECCN 1312A].

TR vol. 14, p. 48.

In those instructions, I further construed "specially designed" as contemplating two basic elements. The jury was told it should consider, first, whether the defendants' control panel was "intended" to control a covered HIP, and second, whether it

had the "effective capacity" to do so when shipped. TR vol. 14, p. 48–49. I emphasized that " 'specially designed' does not mean designed for an exclusive purpose." TR vol. 14, p. 49. Thus, I concluded:

> [Y]ou can find that a control panel such as the one at issue here was "specially designed" for a [covered HIP] even if you find that the panel could have been used for other purposes or another purpose, so long as you find that among the purposes for which it was designed was the intent to control a [covered HIP] and that it had the effective capacity to do so when it was shipped.

*Id.*

This construction of the term "specially designed" was developed in the intensive and extensive pre-trial proceedings I considered necessary for this case. The definition I gave for ECCN 1312A was consistent as well with the trial testimony of both Dhir and William L. Clements, the Director of the BXA's Office of Technology and Policy Analysis (and thus Dhir's immediate supervisor) from March 1989 through February 1994. To be sure, portions of Dhir's testimony did appear to suggest that he considered *mere capability* to control a covered HIP, without the further element of a particularized design intent, as sufficient to satisfy the meaning of "specially designed." [13] TR vol. 7, p. 23–24. However, other portions of Dhir's testimony implied that design intent could not be entirely factored out of the analysis. *See* TR vol. 7, p. 69, 88. Clements was more direct when he affirmed that a central question for his office was "What did the manufacturer really intend in how this was put together?" TR vol. 2, p. 89.

---

**13.** For example, Dhir testified, in relation to the defendants' control panel, "The fact that it has the capability—the inherent capability to control a [covered HIP] ... is reason enough that it's [covered as well]." TR vol. 7, p. 23.

Before finally settling upon the actual jury instruction, I also considered, of course, the testimony of defense witness William A. Root, a former State Department official who had participated in CO-COM negotiations, regarding the industry understanding of "specially designed." Root testified that, in the mid–1980s, the common industry understanding was that "specially designed," in the context of the Control List generally, contemplated "a special feature . . . responsible for achieving the performance level specified in the ECCN," TR vol. 10, p. 43, and not just any feature that contributed to that end. Root further testified that an industry group, the Industry Coalition on Technology Transfer ("ICOTT"), in 1985 had proposed to the Commerce Department that it formally sanction this definition under the replacement term of "required" (which ICOTT considered to be more precise than "specially designed"). TR vol. 10, p. 41–42, 63.

Root's testimony, which I permitted on the question of the defendants' scienter, did not go to the Commerce Department's own understanding of "specially designed." Indeed, Root admitted that the Commerce Department accepted ICOTT's proposed definition only to the extent that the Export Regulations were revised so as to cover *technology* related to controlled equipment only if "required" for that equipment. TR vol. 10, p. 61–64; *see also* 15 C.F.R. § 799.1, Supp. 3 (language first appearing in 1992 CFR) (defining "required" as meaning "peculiarly responsible for achieving or exceeding the embargoed performance levels, characteristics, or functions"). At trial, the industry understanding of "specially designed," as reflected in Root's testimony, did not strike me as a sufficiently robust alternative to what I understood to be the Commerce Department's customary interpretation of "specially designed," where it was admitted that ICOTT itself considered the industry understanding to be better captured by another term (*i.e.*, "required").

### D.  *Defendants' Post–Trial Motions*

The defendants principal motion for judgment of acquittal notwithstanding the verdict, or in the alternative, for a new trial, is founded on newly discovered evidence,[14] developed in connection with protracted post-trial proceedings, demonstrating, according to the defendants: (i) that as of April 1988, the Commerce Department had consistently interpreted the term "specially designed," as used not just at ECCN 1312A but throughout the Control List,[15] to mean "used solely for a particular purpose," along the lines of the MTCR

14.  At various points in the post-trial proceedings, the government has contended that the materials submitted by the defendants after the verdict in support of their post-trial motions do not constitute new evidence. Given the restrictions placed on discovery pre-trial—in light of concerns about overbreadth to the disclosure of classified information which then appeared to be of little relevance—and the general difficulties in otherwise obtaining informal discovery in this context, I believe the defendants' submissions may properly be characterized as presenting new evidence. The submissions include a variety of materials which, under the circumstances, the defendants could not reasonably have been expected to have developed pre-trial and, given the interrelationships among the various pieces of evidence, provide newly apparent significance and meaningful new perspective to what might be characterized as "old" evidence.

15.  I note that in their original affidavits, neither Dhir nor Webb suggested that his rendition of the Commerce Department's understanding of "specially designed" was specific to usage of the term in ECCN 1312A. Indeed, both testified that they were speaking to the meaning of "specially designed" as it appeared in the Control List more generally. Webb Aff., Doc. No. 121, Ex. A, ¶¶ 5, 6; Dhir Aff., *id.*, Ex. B, ¶¶ 7,9.

definition of the term; and (ii) that such an interpretation would have been the proper one, on the basis of the term's history, including COCOM custom and usage.

In this connection, the defendants further contend that the government has proven unable, even after extensive post-trial discovery, to supply evidence that the Commerce Department *ever* endorsed the "intended for and capable of use with" definition on which I based my jury instruction. At a minimum, the defendants conclude, they have established that the Commerce Department did or ought to have interpreted the term more narrowly. As a consequence, they contend, there are due process objections to the imposition of criminal punishment on the basis of the interpretation I used to instruct the jury.

In this setting, then, I must first determine what definition for "specially designed" as used in ECCN 1312A the record now before me supports as having been operative in April 1988, when the defendants shipped the control panel in question to the Indian government. If, in fact, that definition was not consistent with the meaning as I instructed the jury, I must next consider whether due process concerns are raised by the defendants' convictions.

## II. ANALYTICAL FRAMEWORK

 As an initial matter, I note that I must accord considerable deference to the Commerce Department's interpretation of its own regulations, rejecting it only if it is "plainly erroneous or inconsistent with the regulation." *Fina Oil & Chem. Co. v. Norton,* 332 F.3d 672 (D.C.Cir.2003); *see U.S. Air Tour Assoc. v. Fed. Aviation*

*Admin.,* 298 F.3d 997, 1005 (D.C.Cir.2002) (citing *Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997)). Indeed, even where there are "several competing interpretations" of a regulation, courts must "give effect to the agency's interpretation so long as it . . . sensibly conforms to the purpose and wording" of the regulation. *Id.* (internal citation omitted). Such deference is "particularly important," moreover, where, as with the United States export control regime, "a technically complex statutory scheme is backed by an even more complex and comprehensive set of regulations." [16] *Gen. Elec. v. U.S. Envtl. Prot. Agency,* 53 F.3d 1324, 1327 (D.C.Cir.1995).

To the extent that Control List items like ECCN 1312A are transposed directly from a COCOM list,[17] however, the defendants contend that this degree of deference is diminished in view of any evidence of relevant COCOM custom and usage. I consider such evidence to provide helpful insight into whether the Commerce Department's interpretation of ECCN 1312A's use of "specially designed," in particular, was a reasonable one, broadly consistent with that language and its history. *See Trinity Broad. of Florida, Inc. v. Fed. Communications Comm'n,* 211 F.3d 618, 627 (D.C.Cir.2000). Nevertheless, I must decline to substitute my own best reading of relevant COCOM custom and usage, as well as of other evidence going to the history of ECCN 1312A's use of "specially designed," for a plausible Commerce Department interpretation. In part, this is due to reluctance on my part, especially in the apparent absence of decisional sup-

---

**16.** For criticism of the complexity of the Export Regulations and the attached Control List, especially as they existed in the late 1980s, *see, e.g.,* General Accounting Office Re-

port, GAO/NSIAD–91–47 (Dec.1990), Doc. No. 452, Ex. C, at 9–11.

**17.** Pursuant to the Export Act's grant of authority.

port, to treat regulatory language drawn from multinational negotiations as qualitatively different from "ordinary" regulatory language, such as to eliminate administrative discretion on the part of the promulgating agency of the United States government. Moreover, even if that reluctance were not justified, the Commerce Department's interpretation should nevertheless be analogized to an agency's construction of a statute that it administers, and CO-COM's failure to settle on an agreed definition of "specially designed" for purposes of its own list treated as indication of the absence of any "unambiguously expressed intent," thus again focusing attention on whether the Commerce Department's interpretation was a "permissible" (if perhaps not the best) one. *Cf. Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

Guided by this interpretive framework, I will proceed to detail and then analyze the defendants' post-trial submissions, with a view towards reconsidering what the Commerce Department's interpretation of ECCN 1312A's use of "specially designed" was in April 1988. In this connection, I address the *separate* question whether the Commerce Department's interpretation, to the extent that I am able to identify it, would have allowed a regulated party in turn to identify with "ascertainable certainty" the potential imposition of criminal liability. *Trinity Broad.,* 211 F.3d at 628; *Gen. Electric v. U.S. Environmental Protection Agency,* 53 F.3d 1324, 1329 (D.C.Cir.1995).

## III. DEFENDANTS' POST-TRIAL SUBMISSIONS

The defendants' post-trial submissions regarding the operative meaning of ECCN 1312A's use of "specially designed" in April 1988 fall under two categories: first, evidence going to the Commerce Department's actual interpretation of the term at that time, and second, evidence concerning the term's history, including COCOM custom and usage. In keeping with the interpretive framework I have outlined in the previous section, I will detail these two categories of evidence separately.

### A. Evidence Going to the Commerce Department's Interpretation of the Term "Specially Designed"

The defendants contend that, as of April 1988, the Commerce Department had consistently interpreted the Control List's use of the term "specially designed" in all instances to mean "used solely for a particular purpose," on the basis of (1) the official record of statements made by the U.S. delegation at COCOM meetings, (2) evidence of statements made by Commerce Department officials at public educational seminars, and (3) the affidavit testimony of numerous former Commerce Department officials. This evidence was submitted to me for the first time during the course of post-trial proceedings.

### 1. Statements made by the U.S. delegation at COCOM meetings

The defendants place greatest emphasis on official minutes dated April 9, 1975 of a COCOM meeting regarding COCOM Industrial List ("IL") Items 1080 and 1086.[18]

---

18. The defendants obtained this 1975 document on a "declassified basis from a German trial in Darmstadt." Root Aff., Doc. No. 351, Ex. A, B ¶ 6. The government maintains that the document remains classified to this day in its original form. Doc. No. 533. The govern-

ment has, however, provided an unclassified version of the document in a redacted form. *Id.;* Doc. 514, Ex. 2. Attachment. I find that I can convey the significance of the document to the reasoning in this memorandum by reference to only the unclassified version and

COCOM Doc. REV. (74) 1080/3 B and 1086/3 B (Apr. 9, 1975), Doc. No. 321. Item 1080 covered "machines ... specially designed for making ... gas turbine blades"; Item 1086 covered "machines specially designed for the manufacture of jet engines." In each case, I note, the term "specially designed" appeared at the definitional heading of the item in question, and not in relation to some sub-item.[19] The minutes for this meeting reflect, at paragraph 18, that the U.S. delegation acknowledged:

> [I]t was standard practice in the context of [COCOM lists] to make use of the term 'specially designed' and that [CO-COM] had resorted to it in a number of cases when it had been difficult to define exactly the equipments it was desired to embargo.

In the next sentence, the U.S. delegation went on to state:

> What was meant by "specially designed" was an equipment used solely for a particular purpose[.]

Some further indication of what the U.S. delegation sought to express by this formulation can be found at paragraph 15, where the delegation noted that specific sub-items it proposed to add under Item 1080 "might involve standard equipments to which special fixtures and tooling were added." Given Item 1080's general limitation to equipment "specially designed for making ... gas turbine blades," the U.S. delegation explained that their aim was

> to cover solely those specialized equipments, while standard equipments, which were less rapid, less economical and less efficient would remain outside the embargo.

As a consequence of the defendants' discovery of these April 9, 1975 minutes, I directed the government to obtain from the COCOM archives in Paris and disclose additional COCOM minutes that included further reference to the meaning of "specially designed," particularly in relation to the COCOM item, IL Item 1312, which ECCN 1312A tracked. In January 1996, the government submitted minutes dating from January 28, 1981 to May 14, 1990 of COCOM discussions regarding IL Item 1312. January 1996 Disclosure of Minutes (not docketed). In February 1996, the government further disclosed minutes of COCOM discussions regarding the predecessor to Item 1312—Item 1072—as well as regarding Items 1080 and 1086 (the same items at issue in the April 9, 1975 minutes discovered by the defendants). February 1996 Disclosure of Minutes (not docketed). The defendants have not identified any further statements in these disclosures [20] by the U.S. delegation to support an "exclusive use" definition for the term "specially designed." By the same token, the defendants contend that the government's disclosures also do not contain anything to contradict the view stated by the U.S. delegation at the meeting recorded by the April 9, 1975 minutes.

After their discovery of the April 9, 1975 minutes, however, the defendants also discovered portions of what appear to be

---

will do so without referring to the document in its classified form.

19. By contrast, the term "specially designed" was used in relation to a sub-item under ECCN 1312A.

20. Which, I note, the defendants claim to be incomplete, based on their review of an unclassified index to classified COCOM docu-

ments that is located in the Reading Room of the State Department. The defendants also have challenged as inaccurate the government's representation that COCOM records are not maintained in the United States but only in Paris. Given my disposition of the motions, I do not need to resolve these discovery disputes.

February 27, 1986 minutes of a COCOM meeting regarding IL Item 1417 which they contend further support their characterization of the Commerce Department's relevant interpretation of "specially designed." [21] COCOM Doc. DEF (85) 1417/1.3 (Feb. 27, 1986), Good Aff., Doc. No. 413, Ex. 1. At issue was a U.S. proposal to add to Item 1417 a sub-item covering, *inter alia*, "[p]hotographic cameras specially designed for use underwater and capable of any of the following: ...." COCOM Doc. DEF (85) 1417/1 (Dec. 11, 1985), *id.* at 1. The defendants particularly note that the U.S. delegation is reported to have insisted on retaining the language of "capable of any of the following" for the proposed sub-item because

> they wished to cover equipment ... "capable of" being used underwater and not only those "specially designed or modified for" use underwater.

*Id.* at p. 3, ¶ 49. Thus, the defendants conclude, the U.S. delegation clearly conceived of the term "specially designed or modified"—itself broader than simply "specially designed"—as covering a narrower scope than the term "capable of."

### 2. *Public statements by Commerce Department officials*

The defendants also submit evidence that Commerce Department officials have announced an "exclusive use" definition for the term "specially designed" at various public educational seminars for industry audiences. The defendants' evidence primarily consists of the affidavit of Richard J. Sheil, until December 1988 a senior licensing officer in the BXA's Electronic Equipment Division, who states that the definition for "specially designed" that both he and other Commerce Department officials gave at these seminars was as follows:

> [A] product or component is only specially designed for a certain product or purpose if it can only be used for that product or purpose.

Sheil Aff., Doc. No. 351, Ex. C, ¶¶ 8, 10. In a supplemental affidavit, Sheil further asserts that, "In my experience, that was the only meaning of the term 'specially designed' that was consistently used within [the Commerce Department]." Sheil Supp. Aff., Doc. No. 440, Ex. D, ¶ 1.

In connection with Sheil's submission, the defendants additionally submit the affidavits of Harald H. Roth, a German lawyer specializing in the field of export controls, and Pat Paulson, a former export administrator for various companies, who both state that they specifically recall that Sheil gave the above quoted definition for "specially designed" at a conference organized by an industry group together with the Commerce Department in San Diego, California in March 1988. Roth Aff., Doc. No. 351, Ex. E, ¶ 12; Paulson Aff., Doc. No. 419, ¶¶ 2–4.

### 3. *Affidavits of former Commerce Department officials*

The defendants' set of evidentiary submissions going to the Commerce Department's actual interpretation of the term "specially designed" in April 1988 consists of the affidavits of a number of former Commerce Department officials.

---

21. According to defense counsel, the document was received from a Dr. G. Welzien in Kronberg, Germany. Good Aff., Doc. No. 413 ¶¶ 2–5. Based upon "communications previously received from Dr. G. Welzien," Good asserts that he is "informed and believe[s] that the information contained in the five pages was referred to in public proceedings during a German trial, and accurately describe statements made by delegates to COCOM proceedings...." *Id.*, ¶ 5. The government maintains that this document remains to this day classified in its entirety and has not been unclassified even in a redacted form.

Most clearly articulating an "exclusive use" definition are the affidavits of Donald Hammond, employed with the BXA's Office of Technology and Policy Analysis from 1983 through 1987, and Nicholas F. Maddage, a former BXA licensing officer who retired in 1992 as Chief of the BXA's Office of Export Licensing. Hammond contends that during his tenure at the Office of Technology and Policy Analysis, he understood that "specially designed" referred to "items with a unique use, that is[,] components which could be used with an 'export controlled' item and no other." Hammond Aff., Doc. No. 351, Ex. D, ¶ 2. Similarly, Maddage asserts that:

> It is now and has always been my understanding, over the years, that if a component, part, accessory or control unit is capable of being used with both controlled and uncontrolled equipment, it is clearly not 'specially designed' even if the component, part, accessory or control unit is actually intended to be used with controlled equipment.

Maddage Aff., Doc. No. 487, Ex. A, ¶ 4.

Slightly different from the above is the affidavit of Joseph F. Dytrt, until August 1979 the Director of the BXA's Capital Goods Division.[22] Dytrt asserts that the term "specially designed," as used in CO-COM's lists, had, to his understanding, *two* meanings:[23] First, Dytrt says the term, when part of a definitional heading (as in the case of COCOM IL Items 1080 and 1086), meant "designed to inherently or

purposefully possess characteristics or features peculiar to performing those tasks … necessary" (*e.g.*, for making gas turbine blades, or jet engines, as the case might be). Dytrt Aff., Doc. No. 487, Ex. B, ¶ 5. This definition, I note, appears comparable to the definition for "specially designed" that, according to Root's trial testimony, ICOTT proposed to the Commerce Department under the replacement term "required." TR vol. 10, p. 43, 63. Second, Dytrt contends that, when part of a subitem under a definitional heading, as in the case of "controls … specially designed" for a covered HIP, the term took on an "exclusive use" meaning. In Dytrt's words the meaning was "peculiar to and solely used in or with the item(s) defined by the definitional heading."[24] Dytrt Aff., Doc. No. 487, Ex. B, ¶ 5.

The defendants also submit the affidavit of Daniel E. Cook, employed from February 1966 to July 1994 by the BXA and its predecessor agencies, in further support of their position. Cook Aff., Doc. No. 351, Ex. F, ¶ 1. Cook contends that his understanding of "specially designed," while employed at the Commerce Department, was that:

> the equipment in question had to be more than capable of operating the [covered] item, but rather had to have some capability unique to operating the [covered] features of the [covered] item and

---

22. From his affidavit, it is unclear whether Dytrt in fact was, as the defendants claim, a predecessor to Dhir as the Director of the Capital Goods Technology Center of the BXA's Office of Technology and Policy Analysis, or instead was the Director of the analogous Capital Goods Branch under the BXA's Office of Export Licensing.

23. Dytrt asserts that these meanings were developed during the 1974–75 COCOM List Review, in which he participated, and until that

time "the phrase was without a consistent meaning[.]" Dytrt Aff., Doc. No. 487, Ex. B, ¶ 6.

24. In another affidavit submitted by the defendants, Alan B. Minthorne, a former licensing officer who worked under Dytrt at the BXA's Capital Goods Division, confirms that this bifurcated meaning was that which he and other licensing officers applied. Minthorne Aff., Doc. No. 440, Ex. C, ¶ 4.

that [was] not required to operate [a non-covered] item.

*Id.* at ¶ 4. Thus, like those submitted by his former colleagues, Cook's affidavit also disputes the notion that the Commerce Department during his tenure interpreted the term "specially designed," in any Control List context, as contemplating simply capability of use with a covered item.

### B. *Evidence Concerning the History of the Term "Specially Designed"*

As corroboration of the Commerce Department's actual interpretation of "specially designed," the defendants contend that the best reading of the term's history, including COCOM custom and usage, as of April 1988, would support an "exclusive use" definition.

#### 1. *COCOM custom and usage*

I find no reference to any significant statements made by any delegation in the course of COCOM meetings, other than those of the U.S. delegation discussed above in Section III.A., *supra*, that are of sufficient clarity to support the defendants' characterization of COCOM custom and usage.[25] Apart from those statements of the U.S. delegation, and the affidavits of former Commerce Department officials asserting what they considered COCOM custom and usage to be, the only meaningful additional evidence that the defendants proffer in this particular regard[26] appears to consist of the affidavits of Gregory C. De Santis, a former Defense Department official with primary responsibility within that Department for COCOM technical negotiations, and Mario Dorigo, a Dutch official who served from 1985 to 1996 as one of three negotiators for the Netherlands at COCOM.

In his affidavit, De Santis asserts that the "COCOM-derived and accepted meaning" of "specially designed" consistently has been "hav[ing] no application other than for or in the [covered] commodity." De Santis Aff., Doc. No. 423, ¶ 12. De Santis further characterizes the relevant implications of such a narrow definition by adding, in a supplemental affidavit, that from 1978 on, it was the "shared understanding at COCOM that the only controls subject to embargo were *computerized controls.*"[27] Supp. De Santis Aff., Doc. No. 440, Ex. G, ¶¶ 10–11.

---

**25.** I do, however, note that in minutes dated March 15, 1978 of COCOM discussions concerning IL Item 1081, which covered stretch form presses "specially designed" for use in the aeronautic industry, the U.S. delegation appears to have used a definition of 'specially designed' different from that pressed by defendants. In those minutes, the U.S. delegation expressly stated that a stretch form press could be deemed "specially designed" for the aeronautic industry if it "contained capabilities for use in the aeronautic industry which presses of other design did not," even if the press actually could be used in another industry. COCOM Doc. DEF. (78) 1081/1 and 1072/1 (March 15, 1978), ¶ 2. [February 1996 Disclosure of Minutes (not docketed).]

**26.** In this connection, I do not find, to the extent that it is meant to reflect on COCOM custom and usage, the defendants' submission regarding British prosecutions brought and then aborted in the early 1990s in connection with exports of armaments to Iraq, Good Aff., Doc. No. 418, sufficiently clear to be of assistance.

**27.** The defendants contend that, as of April 1988, "specially designed . . . controls" under COCOM IL Item 1312 was meant only to refer to computerized controls. These controls, they contend, were the best means—and hence most significant form of technology—with which to operate a HIP. In this regard, they submit the affidavit of Marc H. Richman, a Professor of Engineering at Brown University, as evidence of the degree to which computerized controls "can more reliably, efficiently and inexpensively enable . . . uniform production than can HIP controls which are neither automated nor designed to measure . . . characteristics of the material being processed." Richman Aff., Doc. No. 403, ¶ 7.

Without reference to the issue of computerization, Dorigo similarly states that, notwithstanding "occasional disagreements about the application of the term 'specially designed' to particular pieces of equipment," it was "generally understood" within the COCOM context that:

If, for example, a control unit was capable of use with both [covered] and [non-covered] equipment, it would not have been 'specially designed' for the controlled equipment, even if it was actually intended to be used with the [covered] equipment.

Dorigo Aff., Doc. No. 487, Ex. C, ¶¶ 5–6. Thus, Dorigo adds, the current MTCR definition of "specially designed" is in fact "identical to the meaning of those words that had been widely used at COCOM for many years." *Id.* at ¶ 7.

### 2. *Prior use of the term "specially fabricated"*

The defendants also submit evidence that under the pre–1977 predecessor to the Control List, an export control list for dual-use commodities titled "Schedule B," the term "specially designed" was deployed in connection with component parts as a replacement for the term "specially fabricated." The defendants further contend that the Commerce Department considered the two terms to be equivalent, and in the mid 1960s substituted "specially designed" for "specially fabricated" purely in the interests of standardization. Root Aff., Doc. No. 440, Ex. H, ¶ 4.

The reason the defendants seek to establish this equivalence is because the term "specially fabricated" was expressly defined, in the 1958 through 1962 editions of the Schedule B list, as having an "exclusive use" meaning:

The term *"specially fabricated"* is used to describe parts which are so constructed as to be usable (1) with only one machine or type of machine, for which a single classification is provided in Schedule B, or (2) for a well-defined group of the same type machines (having the same general function) involving more than one classification in Schedule B. The term "specially fabricated," as used in Schedule B, carries no implication that the item to which it is applied was individually designed or manufactured. It indicates that the form of the item is such that its use is limited to the particular machines or equipment for which it is described as being specially fabricated. The fact that a part, in a given instance, is being shipped for use on a given machine, does not, of itself, constitute a basis for considering the part to be specially fabricated for the machine in which it will be incorporated. *It is not a specially fabricated part for that machine unless it is so constructed that its use for all practical purposes is limited to that machine.*

Schedule B, Statistical Classification of Domestic and Foreign Commodities Exported from the United States, Introduction (January 1958 ed., reprinted January 1962) (emphasis added). Doc. No. 467, Ex. 1.

In support of their argument, the defendants first submit evidence that in the mid 1950s, the Schedule B list often used the term "specially fabricated" where the CO-COM Industrial List used the term "specially designed," and in particular, with reference to capital goods such as vacuum pumps, generators, turbines, automotive vehicles, railway traffic controls, and magnetometers.[28] Root Aff., Doc. No. 440, Ex.

---

**28.** The defendants' discovery in this regard was made possible by the general declassification of COCOM documents over 30 years old

by the former COCOM member nations as of May 19, 1995, shortly after conclusion of the

H, ¶ 10. The defendants next submit evidence of instances, albeit not precisely analogous to those just referenced, where the Schedule B list was revised in 1965 to replace use of the term "specially fabricated" with the term "specially designed." *Id.* at ¶¶ 4, 5 n. 2.

The defendants characterize declassified records concerning COCOM discussions in late 1963/early 1964 about IL Item 1129 as "the most direct evidence" that substitution of "specially designed" for "specially fabricated" in the Schedule B list was made merely in order to standardize usage with what had become standard COCOM terminology. IL Item 1129 covered ion vacuum pumps. Records dated August 20, 1963 and January 20, 1964 reveal that the U.S. delegation had proposed extending coverage to "specially fabricated parts, controls and accessories" for such pumps, 1963 COCOM List Review Proposal for IL 1129 (Aug. 20, 1963), Doc. No. 467, Ex. 3, and that on the request of the chairman of the relevant COCOM subcommittee, the United States had agreed to substitute "the more usual term of '[s]pecially de-

signed' for the term '[s]pecially fabricated'" in its proposed text. ANNEX to COCOM Doc. REV. (63) 1129/1 (Jan. 20, 1964), ¶ 20, Doc. No. 467, Ex. 4. A State Department cablegram dated November 6, 1963 notes that the subcommittee chairman had made the request "in the interest of standardization." POLTO A 322, USRO/PARIS, 1963 List Review: Item 1129 (Nov. 7, 1963), Doc. No. 467, Ex. 5. According to the defendants, the fact that the U.S. delegation easily accepted the change reveals that the U.S. government considered the two terms to be identical, and did so just around the same time as the Commerce Department was revising the terminology of the Schedule B list.[29]

### 3. *History of the 1991 revision of the MTCR Annex*

Finally, the defendants challenge Webb's prior affidavit testimony by contending that the history of the 1991 revision of the MTCR Annex reveals that the "exclusive use" definition adopted for the term "specially designed" in the MTCR context was meant to reflect the prior

---

trial in this case. Root Aff., Doc. No. 440, Ex. H, ¶ 2.

29. The defendants also cite declassified minutes of COCOM discussions in late 1959/early 1960 about IL Item 1072 for the proposition that the U.S. delegation considered the term "specially fabricated" superfluous where the term "specially designed" also was present. Root Aff., Doc. No. 440, Ex. H, ¶ 9. Specifically, the defendants note that the U.S. delegation had originally proposed that IL Item 1072 contain heading language covering "[p]resses and specialized controls, accessories and parts therefor," as well as sub-heading language covering "[c]ontrol equipment, accessories and parts which are specially designed for the above presses." COCOM Doc. No. 3710.72/4 (Dec. 19, 1959), ¶ 1, *id.* at Annex H. The U.S. delegation later appears to have amended its proposal so that the heading language would cover "[p]resses, high energy rate, and specially fabricated parts and

accessories therefor[.]" ANNEX to COCOM Doc. No. 4910.72/1 (undated), ¶ 9, *id.* In its final proposal (which was the version ultimately accepted by the other delegations), the U.S. delegation revised the heading language yet again to delete the reference to "specially fabricated parts and accessories." *Id.*, ¶¶ 11–12. The defendants' inference that this heading language was considered superfluous in light of the sub-heading language covering "[c]ontrol equipment, accessories and parts which are specially designed for the above presses" is a reasonable one. I do not consider this inference to provide much support, however, for the defendants' larger contention that the Commerce Department viewed the terms "specially fabricated" and "specially designed" as equivalent. After all, it is obvious that a term may be rendered superfluous not only by a another term with an identical meaning, but also by another term with a *broader* meaning.

meaning of the term in both the MTCR and COCOM contexts.

The defendants' view rests on a factual contention, stated in a supplemental affidavit submitted by Root, that is directly at odds with Webb's prior testimony. Webb had testified that the purpose animating the 1991 revision of the MTCR Annex was to *narrow* coverage to commodities directly related to missile systems, thus necessitating a more stringent definition for the term "specially designed." Webb Aff., Doc. No. 121, Ex. A, ¶ 17. Root now asserts that the purpose animating the revision actually was to *broaden* coverage, at least to the extent that use of the term "specially designed" was deemed, in Root's words, to "unacceptably narrow[ ] coverage of items of missile concern." Supp. Root Aff., Doc. No. 422, ¶ 10.

As evidence of this concern, Root submits along with his affidavit a letter dated November 26, 1990 from Boyd J. McKelvain, the chairman of an advisory committee—the Militarily Critical Technologies List Implementation Technical Advisory Committee ("MITAC")—established under the Export Act to provide a means for industry to advise the government, to James LeMunyon, the Commerce Department's Deputy Assistant Secretary for Export Administration. In the letter, McKelvain responded to LeMunyon's request for comments on draft revisions to the MTCR Annex by noting that an in-depth study of *COCOM terminology* had revealed that

"[t]he concept of 'specially designed' can be inadequate to capture items that are dual use." *Id.* at Attachment 3. More supportive of Root's factual contention, albeit backed by no similar documentary evidence, is his assertion that the 1991 revision of the MTCR Annex largely consisted of replacing instances of the term "specially designed" with a broader term, either "designed or modified," or even more broadly, "usable in" or "capable of." [30] *Id.*, ¶ 5.

Under the defendants' view, then, the 1991 revision of the MTCR item sharing some degree of overlap with ECCN 1312A, MTCR Item 7(c)-Category II, did not substitute use of the term "designed or modified" for the term "specially designed" in order to retain the item's original scope, as Webb submitted prior to trial, Webb Aff., Doc. No. 121, Ex. A, ¶ 19, but rather did so in order to broaden the item's scope from its previous "exclusive use" strictures.

## IV.  THE GOVERNMENT'S RESPONSE

The government's response to the defendants' post-trial submissions has evolved over time. The government has variously contended that the U.S. delegation's statements regarding the meaning of the term "specially designed" at the COCOM meeting recorded by the April 9, 1975 minutes were "simply in error"; [31] that Commerce Department officials speaking at public educational seminars are not authorized to

---

**30.** I note that the 1991 revision of the MTCR Annex also added a definition for the terms, deemed interchangeable, "usable in" and "capable of." That definition reads: " '*Usable In*' or '*Capable Of*' describes equipment, parts, components or software which are suitable for a particular purpose. There is no need for the equipment, parts, components or software to have been configured, modified or specified for the particular purpose. For example, any military specification memory circuit would be 'capable of' operation in a

guidance system." MTCR Equipment and Technology Annex, Webb Aff., Doc. No. 121, Ex. A3.

**31.** The government raised this argument at the November 29, 1995 hearing, and then repeated it in the cover letter to its February 1996 disclosure of COCOM minutes. Cover Letter, February 1996 Disclosure of Minutes (not docketed).

"supply 'official' definitions for terms that are not expressly defined in the [Export] Regulations"; [32] and that the defendants' submission of affidavits by former Commerce Department officials cannot qualify as "newly discovered" evidence, because they must be understood as representing industry views, as to which there already was trial testimony.

Ultimately, however, the government has come to concede that, as of April 1988, "some licensing officers and engineers at the Department of Commerce and the larger export community employed an exclusive use interpretation of 'specially designed' as to different commodities and ECCNs[.]" Doc. No. 477 at 8. Drawing on the affidavit of Jerald R. Beiter—as of August 1997 the Special Assistant to the Commerce Department's Deputy Assistant Secretary for Export Administration, and in April 1988 a senior electronics engineer in the Electronic Technology Center of the BXA's Office of Technology and Policy Analysis—the government now contends that, during the relevant time period, different interpretations of "specially designed" were employed on a "category-by-category basis." Beiter Aff., Doc. No. 510, Ex. C, ¶ 7. In particular, Beiter asserts that a narrow definition of "specially designed" was applied to electronic items, because of the rapid proliferation of non-strategic uses for electronic technology. *Id.*, ¶ 8. By contrast, Beiter asserts that a broader definition of "specially designed," not limited to "exclusive use," consistently was applied to capital goods, which do not pose the same problem. *Id.*

For his part, Webb has filed a supplemental post-trial affidavit in which he emphasizes that his pre-trial submission regarding the meaning of the term "specially designed" was based on his experience within the Capital Goods Technology Center of the BXA's Office of Technology and Policy Analysis, and was not meant to represent the meaning of the term as used with respect to commodities other than capital goods.[33] Supp. Webb Aff., Doc. No. 510, Ex. G, ¶ 3.

As for the precise definition of "specially designed" applied by the Commerce Department in the context of ECCN 1312A, the government maintains that it was accurately expressed by my jury instruction in this case, comprising the twin elements of an "intentional design" plus "effective capacity to be used for certain predetermined purposes." In advancing this view, the government vigorously disputes the defendants' oft-stated contention that my jury instruction defined "specially de-

**32.** The government here quoted the affidavit of Ian S. Baird, as of August 1997 the Commerce Department's Deputy Assistant Secretary for Export Administration, and from August 1988 to April 1995, the Director of the BXA's Office of Export Licensing. Baird Aff., Doc. No. 510, Ex. E, ¶ 7. For the same proposition, the government also submitted the affidavit of Eileen M. Albanese, as of August 1997 the Director of the BXA's Office of Exporter Services, an office described as "the focal point within BXA for outreach to the business community." Albanese Aff., Doc. No. 510, Ex. F, ¶ 1. Albanese asserts that BXA officials speaking at public educational seminars "were not (and are not) authorized to make on-the-spot binding official statements or interpretations of statutory or regulatory provi-

sions," and further, that she could not "recall ever having heard a BXA official claim to give an on-the-spot binding official policy statement at a seminar." *Id.*, ¶ 5.

**33.** In this connection, the government notes that of the former Commerce Department officials whose affidavits have been submitted by the defendants, Sheil, Maddage, Hammond, and Cook have worked in the Electronic Components Branch of the BXA's Office of Export Licensing and/or the Electronic Components Technology Center or Computer Technology Center of the BXA's Office of Technology and Policy Analysis. Beiter Aff., Doc. No. 510, Ex. C, ¶ 11.

signed" for purposes of ECCN 1312A in terms of mere capacity to be used with a covered HIP. Rather, the government seeks to equate my jury instruction with a more narrow definition which, over the course of these post-trial proceedings, it has advanced at various times. This includes: (i) "designed for a special purpose";[34] and (ii) "custom built to have a special capability" as distinguished "from mass produced equipment of general purpose utility."[35] The government also portrays my jury instruction as "tantamount to instructing the jury to consider whether the control panel had features that were peculiarly responsible for the effective operation of a [covered] HIP"[36]—tantamount, in other words, to the definition of "specially designed" proposed by ICOTT to the Commerce Department under the replacement term "required," and adopted in the Control List along with that replacement term specifically with regards to technology.

## V.  ANALYSIS

### A.  *Indeterminacy and the Operative Regulatory Language*

From the limited materials available to me prior to submitting the case to the jury, I fashioned a generic definition for the term "specially designed" for application to the provisions of ECCN 1312A. It was a definition that can be said to be consistent with the plain meaning of the words as later construed by the First Circuit in another regulatory context. *See United States v. Cabrera,* 208 F.3d 309 (1st Cir.2000).[37] But, now presented with the richer context provided by the post-trial submissions, I have concluded that the definition I tailored for the regulatory context in this case was fundamentally wrong. It was not wrong merely because it did not capture the appropriate definition. It was wrong because, given the variety of definitions proliferated in this regulatory context, it is now clear to me there was no determinable definition for the term "specially designed" in connection with ECCN 1312A upon which a criminal proceeding could be mounted.

The post-trial submissions make clear, as the government effectively concedes, that it would not have been reasonable, in light of the term's history, for the Commerce Department to interpret "specially designed" as meaning no more than "capable of use with." But the submissions also make clear that several other interpretations, including the one I tailored for the jury, would have been permissible. The record, however, does not support a finding that the Commerce Department ever in fact adopted any particular interpretation, including those now pressed on me, for ECCN 1312A.

I would, of course, be deferential to an actual Commerce Department interpreta-

**34.**  Doc. No. 510 at 24.

**35.**  Doc. No. 477 at 27.

**36.**  Doc. No. 369 at 7.

**37.**  In *United States v. Cabrera,* 208 F.3d 309 (1st Cir.2000), the First Circuit was presented with the question what made a computer system "specially designed" for producing false identification documents under 18 U.S.C. § 1028(a)(5). The court determined that the term did not cover "ordinary" computer equipment which might have been used to produce false documents. 208 F.3d at 313. In the court's view, the language of "specially designed" clearly cover, however, a computer system "fitted with software and hardware that rendered it *uniquely suited* to produce illicit materials." *Id.* (emphasis added). In finding the system at issue in the case to have been configured with such "special-purpose" features, the court did not consider it problematic that the system could well have been put to "legitimate other uses." *Id.* at 312–313.

tion of "specially designed" for purposes of ECCN 1312A that focused on whether a component, accessory, or control had specific properties that were "peculiarly responsible" or "required" for operating a covered HIP, or that specifically rendered the part "fit for [that] particular application." Such an intermediate interpretation—which is essentially the one for which the government has come to contend post-trial[38]—contemplating more than mere capacity to be used with a covered HIP, but not requiring so much as "exclusive use" would likely have been a reasonable one.

An "exclusive use" definition, of the type stated by the U.S. delegation at the CO-COM meeting recorded by the April 9, 1975 minutes—and pressed throughout this litigation by the defendants covering capital goods—would also be a reasonable Commerce Department interpretation of a definition of "specially designed" in this context.[39] But I cannot say that the Commerce Department was, or is, compelled to adopt an "exclusive use" definition for ECCN 1312A's use of the term "specially designed."

The evidence in this case, as more completely developed in the post-trial submissions, has offered a number of competing interpretations for the term "specially designed" in ECCN 1312A. I chose one; the parties would have me choose some other. I have come to share as an historical matter the contemporary view of the Commerce Department's Inspector General that there has long been dispute about use of the term and that "[b]ecause the term [is] ambiguous," it has been "interpreted in a number of different ways by both the government and industry." *See* Note 40 *infra.* I now decline to refashion yet another interpretation. That is the obligation of the Commerce Department in the first instance and it has yet to meet that obligation with respect to ECCN 1312A sufficiently for purposes of criminal prosecution.

Chief Justice Waite many years ago identified the limited role the courts must play when confronted with indeterminacy

> It would certainly be dangerous if the legislature could set a net large enough

*Commonwealth of Massachusetts v. Blackstone Valley Electric Company,* 67 F.3d 981, 991 (1st Cir.1995). That the reframed interpretation may appear on its face also consistent with a "plain meaning" interpretation does not on the record as it now exists make the case for the government's position stronger. Were I to adopt the government's refined interpretation, I would simply be "placing the gloss of 'plain meaning' on one competing interpretation." *Id.* at 986.

**38.** I note that the interpretation of "specially designed" for ECCN 1312A advanced by the government at this stage of the proceedings is materially different from the Commerce Department interpretation represented by the government prior to and even during trial of this matter. The government did not suggest, prior to the post-trial submissions, that the Commerce Department had applied different interpretations of "specially designed" in different Control List contexts. In fact, the government clearly disputed—both through the Dhir and Webb affidavits and in its cross-examination of Root—the contention that the relevant Commerce Department interpretation required anything more than mere capacity to be used with a covered HIP. In light of the refinement of the government's position, I find the interpretation now advanced by the government to be a "post hoc rationalization"—"tailored to and articulated specifically for purposes of this particular litigation."

**39.** The government contends that even if I were to employ an "exclusive use" definition, the evidence would be sufficient for conviction. While not necessary to the grounds on which I determine defendants' motion, I must register my judgment that the government's case would fail as a matter of sufficiency if the control panel at issue in this case—which could operate the 4.9 HIP—were to be measured against an "exclusive use" definition.

to catch all possible offenders, and leave it to the courts to step inside and say who could rightfully be detained; and who should be set at large. This would, to some extent, substitute the judicial for the legislative department of the government.

*United States v. Reese,* 92 U.S. 214, 221, 23 L.Ed. 563 (1875).

Rather than accepting the parties' invitation again to perform an essentially legislative act by cobbling together yet another definition from the conflicting collection of evidentiary materials the parties have submitted bearing upon the meaning of "specially designed" as used in ECCN 1312A, my obligation at this point is to address the void for vagueness doctrine.

### B. *Void for Vagueness Doctrine*

Having concluded that there is in effect no determinate definition for the term "specially designed" in ECCN 1312A—or, alternatively stated, that the operative regulatory language is vague in all of its applications—I turn to the standards for evaluating whether the vagueness here offends the due process clause of the Constitution.

■ As a general matter, a criminal law may be invalidated for vagueness on either of two independent grounds:

First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement.

*City of Chicago v. Morales,* 527 U.S. 41, 56, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (citing *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983)).

These grounds, the Supreme Court has cautioned, should not be evaluated "mechanically." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S.

489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).

The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment. Thus, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process. The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe. And the Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with the respect to the adequacy of notice to the complainant that his conduct is proscribed.

*Id.* at 498–99, 102 S.Ct. 1186 (citation omitted). I will take up these individual cautionary considerations in the course of separately discussing the alternative grounds of fair notice and fair enforcement.

#### 1. *Fair notice*

■ The law of vagueness has recognized that greater flexibility will be afforded the government in the area of economic regulation than when, for example, rights of free expression are at issue. As a doctrinal matter, this willingness to give the government greater leeway in framing economic regulatory language is in recognition that generally economic regulation does not implicate "perhaps the most important factor affecting the clarity that the

Constitution demands of a law[:] whether it threatens to inhibit the exercise of constitutionally protected rights." *Id.* at 499, 102 S.Ct. 1186.

As a practical matter, the greater flexibility accorded economic regulation appears to turn on a recognition that those involved in regulated economic activity will approach the regulatory regime with some developed sense of the relevant definitions more nuanced than that of the person of ordinary intelligence. Observing that the military has "developed laws and traditions of its own during its long history," the Supreme Court in *Parker v. Levy*, 417 U.S. 733, 743, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), held that "[b]ecause of the factors differentiating military society from civilian society ... the proper standard of review for a vagueness challenge to [articles of the Code of Military Justice] is the standard that applies to criminal statutes regulating economic affairs." *Id.* at 734, 94 S.Ct. 2547. The Court cited approvingly from a pre-Civil War decision upholding the Navy's general article which provided that "all crimes committed by persons belonging to the navy, which are not specified in the foregoing articles shall be punished according to the laws and customs in such cases at sea" for the proposition that "[n]otwithstanding the apparent indeterminateness of such a provision, it is not liable to abuse; for what those crimes are, and how they are to be punished, is well known by the practical men in the navy and army." *Id.* at 747, 94 S.Ct. 2547 (*quoting Dynes v. Hoover*, 61 U.S. 65, (20 How.) 65, 82, 15 L.Ed. 838 (1857)). Similarly, the practical business people who operate regulated economic enterprises can be expected more readily to know and understand certain seemingly open-textured regulatory provisions than the ordinary person.

But here the post-trial submissions have made clear there was no shared understanding among those who work in the realm of exports and their control regarding the term "specially designed," either as a general matter[40] or, as material here, when used in ECCN 1312A in 1988.

■ This failure to provide a serviceable definition understandable to the practical people of the export community is chargeable against the government because it is well established that otherwise unambiguous regulatory language may be rendered too vague to support criminal liability by the particular construction promulgated pursuant to statute by the responsible executive agency. *See, e.g., Trinity Broadcasting*, 211 F.3d at 629 (plain meaning interpretation "might have some force but for the fact that" it was undermined by agency statements); *United States v. An-*

---

**40.** In this connection, I note that in October 1997, the BXA published a request for comments on the definition of "specially designed." 62 Fed.Reg. 56138 (Oct. 29, 1997). In May 2001, a representative from BXA indicated in an advisory committee meeting that the definition had not yet been completed. *See* http://bxa-tac.doc.gov/2001/0509TMNR.htm. She was reported as observing that " '[t]he more we discuss it, the less likely we are' to reach decision this year." *Communications Daily*, 2001 WL 5053162, (May 10, 2001). As of the date of this writing, no definition has been published.

I note further that the Inspector General of the Commerce Department reported at about this time that there was "confusion over the terms " 'specialized' and 'specially designed' " U.S. Department of Commerce Office of Inspector General, "Bureau of Export Administration Management of the Commerce Control List and Related Processes Should Be Improved," Inspection Report No. 1PE–13744 21 (Mar.2001), and that "[t]here has long been debate about the use of terms." Doc. No. 521, Ex. A at 21. The Inspector General observed that "[b]ecause the terms are ambiguous, they are being interpreted in a number of different ways by both the government and industry." *Id.*

*zalone,* 766 F.2d 676, 681 (1st Cir.1985) ("The present ambiguity regarding coverage of the Reporting Act and its regulations has been created by the government itself."). *Cf. Bouie v. City of Columbia,* 378 U.S. 347, 352–53, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964) (striking down on vagueness grounds a state criminal statute featuring "narrow and precise" language in light of "an unforeseeable and retroactive judicial expansion" of that language).

The proliferation of meanings by the government's several representatives charged with developing and explaining the definition of "specially designed" in the export control regime makes particularly instructive the D.C. Circuit's determination in *General Electric.* There the court held that the lack of clarity of the regulations was significantly heightened by the fact that different regional offices of the enforcing agency were applying different interpretations to similar sets of facts. *General Electric,* 53 F.3d at 1332.

I do not find compelling the government's claim that Commerce Department officials applied different definitions of "specially designed" consistently with respect to different categories of items. Drawing on Beiter's affidavit, the government suggested that Commerce Depart-

ment officials consistently applied given definitions of "specially designed" with respect to broad categories of items—for example, applying a broader definition to capital goods, and a narrower one to electronic items. *See* Beiter Aff., Doc. No. 510, Ex. C, ¶¶ 7,8. But the government has acknowledged that Commerce Department officials sometimes applied different definitions of "specially designed" to different commodities even within a certain category.[41] In this setting, whatever consistency may have been exhibited at the highly particularized, item-by-item level does not afford fair notice with respect to the meaning of the term "specially designed" in ECCN 1312A.[42]

The importance of a shared understanding for the term "specially designed" in ECCN 1312A, even in the relatively more flexible setting of economic regulation, becomes especially salient in this proceeding because the government seeks to impose substantial criminal penalties. Thus, the "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe," *Village of Hoffman Estates,* 455 U.S. at 498–99, 102 S.Ct. 1186, has no application here.[43] The potential

---

**41.** The government's concession is no doubt prompted by the fact that the "exclusive use" definition stated by the U.S. delegation at the COCOM meeting recorded by the April 9, 1975 minutes was in reference to capital goods. In this connection, the government submitted the affidavit of Ronald V. Miskell—a longtime employee of Lockheed–Martin who participated, as technical advisor to the Energy Department representative, at the CO-COM meeting recorded by the April 9, 1975 minutes—for the proposition that the "exclusive use" definition stated by the U.S. delegation was not intended to have any applicability beyond the precise items at issue, namely IL Items 1080 and 1086. *See* Miskell Aff., Doc. No. 510, Ex. D, ¶ 6. Having made the definitions idiosyncratic as to each item rath-

er than category, the government cannot properly claim some purported categorical meaning.

**42.** In this connection, I note the observation of the German delegation at the COCOM meeting recorded by the February 27, 1986 minutes to the effect that "different interpretations of the term[ ] 'specially designed' for different Items would have a disastrous effect on the administration of the controls." CO-COM Doc. DEF (85) 1417/1.3 (Feb. 27, 1986), ¶ 53. Good Aff. Doc. No. 413, attached to Defs. Sealed Memo.

**43.** The important distinctions between civil sanctions and criminal penalties are thoughtfully explored in John C. Coffee, Jr., *Paradigms Lost: The Blurring of the Criminal and*

penalties are significant. As part of the post-trial proceedings, I reviewed the Sentencing Guidelines and determined—without addressing possible grounds for departure upward, as the government argued, or downward, as the defendants argued—that the individual defendants fell within a guideline range of 41–51 months in prison and each of the defendants faced a potential fine of $975,000. This is a set of severe sanctions even in the context of precise directives.

Whatever may be the greater tolerance of reviewing courts for imprecise language that may provide the basis for civil sanctions such as debarment,[44] indeterminate language is at its most offensive to due process when liberty is at stake. The bedrock of the void for vagueness doctrine is that "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes," *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939).

The operative regulatory provision governing ECCN 1312A at issue here fails to provide fair notice. Consequently, it may not provide the basis for a criminal prosecution. This is because it is vague "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Coates v. Cincinnati*, 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971).

### 2. *Fair enforcement*

The importance to our system for criminal law enforcement of avoiding vagueness was outlined by the Supreme Court in *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972):

> [i]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

*Id.* at 108–09, 92 S.Ct. 2294.

The dangers are especially acute in connection with the regulatory regime in this case because, as the First Circuit observed in its interlocutory review of certain pretrial evidentiary rulings in this case, "the offense is one grounded in technical regulations and the conduct not inherently likely to be unlawful—the legal tag is malum prohibitum." *Lachman*, 48 F.3d at 591. In this setting, the potential for *ad hoc* and subjective enforcement decision is institutional because there is no inherent unlawfulness of the type recognized in conduct identified as *malum in se*; recognition of illegality here only arises as a result of the positive law pronouncements of rule makers.

The potential for *ad hoc* subjectivity was realized here. In voir dire testimony, the full significance of which I did not appreciate until the post-trial submissions made clear the various ways in which the term "specially designed" was interpreted during the relevant time period in connection

---

*Civil Law Models—And What Can be Done About It*, 101 Yale L.J. 1875 (1992).

**44.** I note that in the comparatively less severe environment of civil sanctions, the government in fact chose in 1997 to terminate debarment proceedings against the defendants initiated as a result of this criminal proceeding. *See generally* Doc. No. 501 (reporting that defendants continue to be involved in various contracts related to United States national security and defense concerns, including the AEGIS and Tomahawk cruise missiles, the Trident sea-launch ballistic missile and support of the National Missile Defense program).

with export control, the government's principal witness on interpretation, Surendra Dhir, conceded just how *ad hoc* and subjective licensing decisions were. After acknowledging that prior determinations regarding the term "specially designed"—but not involving ECCN 1312A—had been made by the Commerce Department, Dhir testified that for as long as he had been at Commerce "in general, the term 'specially designed' was always something that was *not clear.* . . . The term 'special designed' needed further elaborations and interpretations from the Department of Commerce." TR vol. 7 at 105 (emphasis supplied). He was then asked whether this was "[b]ecause it was not clear enough from the ECCN itself?" He replied simply, "That is correct." *Id.; see also id.* at 110–11.

In this setting, the availability of administrative clarification—far from being a mechanism to refine application of a definition—becomes the occasion for an *ad hoc* licensing determination. Under examination by the government, Dhir was asked

Q: . . . it was not possible to make the terms completely objective?

A: That's right.

Q. Could you explain to us why it's not possible to be completely objective with all the terms?

.  .  .  .  .

A: One of the examples is the phrase "specially designed."

This is not necessarily clear to exporters, clearly understood by the exporters. So in such incidences, they are encouraged to come and disclose to us what is exactly being exported or is proposed for export. And they should seek clarification from the Department of Commerce, and the Department to Commerce has always provided guidance.

*Id.* at 134.[45]

No doubt the challenge of providing an objective but serviceable definition of "specially designed" is a demanding one. But this is not "a case where further precision in the [regulatory] language is either impossible or impractical." *Kolender v. Lawson,* 461 U.S. 352, 361, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). The fact that the Commerce Department was, and remains, *see* Note 40 *supra,* unwilling to adopt a general definition for the Control List to cover what is "specially designed" does not provide a writ for bureaucrats to make *ad hoc* determinations by requiring confidential administrative "clarification." As the First Circuit has observed in this case, "if a commodity is not listed, its export does not violate this statute no matter how vehemently the government objects to its export or how swiftly it would deny a license if asked." *Lachman,* 48 F.3d at 592.[46]

---

**45.** In this context, the dialogue between Humpty Dumpty and Alice is not inapposite:
"When *I* use a word," Humpty Dumpty said in a rather scornful tone, "it means just what I choose it to mean—neither more nor less."
"The question is," said Alice, "whether you *can* make words mean so many different things."
"The question is," said Humpty Dumpty, "which is to be master—that's all."
Lewis Carroll, THROUGH THE LOOKING GLASS AND WHAT ALICE FOUND THERE (1896) *reprinted in* MORE ANNOTATED AL-

ICE 253 (Martin Gardner ed., Random House 1990) (emphasis in original).

**46.** It bears noting that the customary mechanism for pre-enforcement review of license denials by a neutral, detached and independent judicial officer was not available under the Export Act. The Act provides that the decision of the Secretary of Commerce to deny a license "shall be final and is not subject to judicial review." 50 U.S.C.App. § 2412(e) (1988).

The regime for determining what "specially designed" in ECCN 1312A meant in 1988 failed to meet "the requirement that a legislature establish minimal guidelines to govern law enforcement." *Kolender*, 461 U.S. at 358, 103 S.Ct. 1855 (quoting *Smith v. Goguen*, 415 U.S. 566, 574, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974)). While it may be too much to say that the result here was the pursuit of personal predilection in enforcement, it is certainly the case that a criminal provision that fails to provide minimal guidelines permits standardless excursions by other decision makers into the province of legislative rule making.

It is not merely the avoidance of due process obligations in rule making which the arrogation of the right to define terms by *ad hoc* bureaucratic "clarification" permits that is put at issue in this case. Here, the court itself was invited to create and then enforce through jury instructions a definition of "specially designed" which was never the subject of a shared and comprehensible normative standard developed through the customary procedures of legislative rule making.

It is no answer that the definition I fashioned carried with it the burden on the part of the government to prove it was transgressed intentionally. Whatever the appropriateness of a scienter requirement in the enforcement scheme for export control,[47] it is a hollow requirement when the underlying prohibition lacks sufficient determinacy to identify at the threshold what is forbidden.

The post-trial submissions have satisfied me that the court in connection with its jury instructions was employed to specify what the government had failed to provide: a comprehensible standard of conduct. The evidence is clear that there were a variety of different definitions of "specially designed" in play within the export community and none had been adopted for ECCN 1312A. This criminal proceeding shifted to the court the occasion to provide a definition. That is a vesting of virtually complete discretion in the court to shape the contours of a criminal provision. And that, like "the whim of any police officer," *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965) cannot, in a constitutional structure that requires due process, be permitted to be the measure of whether a citizen may proceed. Arbitrary enforcement of standardless penal provisions is equally repugnant whether practiced by a policeman or a judge.[48] Both fail to meet the obligation

**47.** It is apparent from the First Circuit's interlocutory opinion in this matter that, while expressing no determinative view, the Court of Appeals was at least skeptical concerning my decision "[w]ith the government acquiescing, to adopt the defendants' theory of intent," holding "that the 'knowing [ ] violat[ion]' requirement of 50 U.S.C.App. § 2410(a) required the government to prove that the defendants knew that the control panel required an individual license." *Lachman*, 48 F.3d at 589; *see also id.* at 591 ("The government here has acquiesced in a stringent, and relatively rare, instruction that—to make out a violation—the defendants must not only have known what they did, but also have know that it was forbidden."). The decision to impose this relatively "stringent" stan-

dard may effectively elide the distinction commentary has recognized between § 2410(a) of the Export Act (with which the defendants were charged) and "the more stringent requirement [of § 2410(b), with which the defendants were not charged] that a defendant act 'willfully.'" A. Hugh Scott, Computer And Intellectual Property Crime: Federal and State Law 201 (2001). I remain of the view, however, that a statute carrying substantial penal sanctions for what otherwise would be *malum prohibitum* conduct, *Lachman* 48 F.3d at 591, should be read to require a high degree of scienter.

**48.** In his thoughtful exploration of judicial innovation in the interpretation of penal statutes, Dean Jeffries has cautioned that "[c]ase-

of fair enforcement that the void for vagueness doctrine has been developed to secure.

### C. *Reprehensibility and Criminality*

While it is accepted that the application of the void for vagueness doctrine depends upon the nature of the enactment, courts confronting vagueness challenges have been circumspect in dealing directly with the public policy choices that generate a particular penal provision.[49] This is no doubt a result of concern that discussion of the underlying public policy considerations would suggest that it is notions of public policy and not precepts of law that the court is applying. Nevertheless, it would be ignoring the obvious to avoid addressing the broader context in which the penal provision arises here. As Professor Amsterdam observed in his classic note over forty years ago, the void for vagueness doctrine "depends not merely upon narrow questions as to the naked comprehensibility of a statutory phrase, but upon the entire context of the regulation attempted—the danger to the public interest of the activity as unregulated and the loss to the individual which results from its regulation." Note, *The Void–for–Vagueness Doctrine in the Supreme Court,* 109 U. Pa. L.Rev. 67, 95–96 (1960).

The context of this case is squarely within the national security interests of this country. It is difficult to conceive an area in which the danger to the public interest is more critical. And, while I sought to avoid unfair prejudice and confusion in the presentation of the evidence to the jury, by attempting to keep the focus on the quotidian details of export licensing rather than the potentially inflammatory prospects of nuclear proliferation, *see generally Lachman,* 48 F.3d at 592–94, I must acknowledge that I have felt obligated to weigh in the void-for-vagueness balance the ongoing national security considerations arising from the provision of equipment which may facilitate nuclear weaponry and thereby threaten stability in South Asia. It is for this reason that my observation in the opening paragraph of this opinion that the defendants' conduct was "reprehensible" is not offered as a gratuitous comment but rather as a calibration, integral to my judgment on the defendants' motion, regarding the weight I attach to the danger presented to the public interest by the defendants' conduct.

I have no doubt, having sat through the trial and extensively and intensively reviewed the record in the context of the post-trial motions, that the defendants here sought—for their own private economic advantage and heedless of the national security interests of this country—to exploit imprecision in the regulatory regime for controlling exports. Yet, after the most careful evaluation of the mass of material presented to me, I cannot—in the face of the defendants' adequately developed[50] void-for-vagueness challenge—sus-

---

by-case criminalization, whether accomplished under the rubrics of the common law or the aegis of a modern statute, threatens both the general values of regularity and even-handedness in the administration of justice and our more specific societal commitment of equality before the law." John Calvin Jeffries, Jr., *Legality, Vagueness and the Construction of Penal Statutes,* 71 Va. L.Rev. 189, 245 (1985).

**49.** A notable exception is Justice Thomas' forceful opinion in *City of Chicago v. Morales,*

527 U.S. 41, 98, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (Thomas, J. dissenting), detailing the ways in which "[t]he human costs exacted by criminal street gangs are inestimable," *id.* at 98–101, 119 S.Ct. 1849, as part of his dissent from the Court's opinion striking down Chicago's Gang Congregation Ordinance as vague.

**50.** Throughout the post-trial proceedings, the defendants have sought additional discovery to support their motions. I have limited and deflected these discovery initiatives in light of

tain a criminal judgment for their failure to obtain a license under ECCN 1312A to export the HIP control panel.

I must emphasize in concluding that this is not an occasion to modify Justice Holmes's adjuration "[m]en must turn square corners when they deal with the Government." *Rock Island, A & L R Co. v. United States,* 254 U.S. 141, 143, 41 S.Ct. 55, 65 L.Ed. 188 (1920). Rather, it is an occasion to emphasize that the Due Process Clause imposes a correlative obligation on the government when it seeks by criminal process to take liberty or property from a defendant: the government must establish legibly orthogonal corners for men to square. The government did not do so in this case and consequently the defendants must be acquitted.

## VI.  CONCLUSION

For the reasons set forth more fully above, I hereby DENY the motion (Doc. No. 318) for new trial based upon Fed. R.Crim.P. 44(c), *see* Note 1 *supra,* and GRANT the defendants' motion (Doc. No. 300) for judgment notwithstanding the verdict.

the classified information which would likely be disclosed. I am, however, satisfied that even with this limited discovery, the defendants have been able to meet their burden of supporting the motion for judgment of acquittal. For its part, the government—which, of course, controls access to classified information—has not been adversely affected in its efforts to oppose the motion because of discovery limitations imposed by the court.