# United States Court of Appeals
## For the First Circuit

Nos. 06-1058, 06-1060, 06-1061

UNITED STATES OF AMERICA,

Appellee,

v.

WALTER L. LACHMAN, FIBER MATERIALS, INC.,
& MATERIALS INTERNATIONAL, INC.,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before
Boudin, Chief Judge,
Selya, Senior Circuit Judge,
and Howard, Circuit Judge.

Michael R. Schneider with whom Salsberg & Schneider was on brief for appellants.
Vijay Shanker, Department of Justice, Criminal Division, Appellate Section, with whom Michael J. Sullivan, United States Attorney, and James D. Herbert, Assistant United States Attorney, were on brief for appellee.

March 26, 2008

**BOUDIN**, **Chief Judge**. This case, arising from defendants' convictions on charges of violating and conspiring to violate the Export Administration Act of 1979 ("EAA") and its implementing regulations, is before us for the third time. The facts and earlier procedural history are recounted in United States v. Lachman, 387 F.3d 42, 46-49 (1st Cir. 2004) ("Lachman II"); United States v. Lachman, 48 F.3d 586, 588 (1st Cir. 1995) ("Lachman I"); and United States v. Lachman, 278 F. Supp. 2d 68, 73-74 (D. Mass. 2003). We first describe briefly what happened and elaborate where necessary below.

The defendants are Fiber Materials, Inc. ("FMI") and Materials International, Inc. ("MI"), a wholly owned subsidiary of FMI (collectively, the "corporate defendants"); Walter L. Lachman ("Lachman"), chairman and principal owner of FMI and president of MI; and Maurice Subilia ("Subilia"), president of FMI. All were convicted by a jury of exporting (and conspiring to export) a control panel for a large hot isostatic press ("HIP") without the export license required by the EAA and its regulations.[1] The underlying facts, in the light most favorable to the jury's

_____

[1]During the relevant time period, the governing statute and regulations were 50 U.S.C. app. § 2403(a) (2000) (requiring exporters to obtain a "validated license" before exporting commodities listed in Department of Commerce regulations) and 15 C.F.R. § 399.1, Supp. 1 (Commodity Control List), Export Control Classification Number ("ECCN") 1312A (1988) (listing HIPs "possessing a chamber cavity with an inside diameter of . . . 5 inches . . . or more" and "all specially designed . . . components, accessories and controls therefor").

-2-

verdict--the posture for sufficiency challenges, see United States v. Downs-Moses, 329 F.3d 253, 257 (1st Cir.), cert. denied sub nom. Ward-O'Neill v. United States, 540 U.S. 916 (2003)--are as follows.

Defendants, acting through FMI's United Kingdom subsidiary, contracted in 1985 with the Indian government's Defense Research and Development Laboratory ("DRDL") to supply a HIP with an 18-inch diameter cavity, along with a control panel. However, they could not obtain a license to export such a large HIP under United Kingdom regulations, which (like United States regulations) required a license to export HIPs with a cavity five inches or larger. The larger HIP can produce densified material useful for ballistic missiles.

So, in January 1987, the parties amended their contract to provide for the export, from the United States, of a smaller 4.9-inch HIP, just under the limit required for a license, and a control panel. On the same day, Subilia signed a letter to the Indian government stating that the control panel to be exported with the 4.9-inch HIP would have "added capacity . . . to provide for future expansion . . . to larger vessel size." In March 1988, defendants contracted with the Indian government to provide a larger HIP and then arranged to have the components of that HIP manufactured by third parties in Switzerland and England and shipped directly to India.

Both plans were carried out. The control panel shipped to India in April 1988 with the 4.9-inch diameter HIP could be used with that HIP but was designed so that it could also control a HIP with a diameter larger than five inches. In particular, the control panel had "controllers" not just for the two "heating zones" contained in the 4.9-inch HIP but also for an additional three heating zones that would be employed for a much larger HIP, and it also had a switch that permitted the disabling of the three additional zones.

In April 1991, after the components of the larger HIP had been delivered to India, defendants' engineers traveled to India, assembled the larger HIP and connected to the larger HIP the control panel that had been shipped with the 4.9-inch HIP. After warning the Indians of the impracticality of trying to operate both the larger HIP and the smaller HIP with the originally provided control panel, the defendants contracted with India to provide a smaller two-zone control panel for use with the smaller HIP.

In July 1993, the defendants were indicted for exporting the five-zone control panel without a license and for conspiring to do so. The government's theory was that the control panel fell within the category of "components, accessories and controls" that had been "specially designed" for the larger HIP and that, while the larger HIP had been made outside the United States, the control panel was in fact intended for use with the larger HIP and

-4-

therefore covered by the statute and the regulations.  <u>See</u> note 1, above.

After a three-week jury trial in March 1995, all four defendants were convicted both on the illegal export count and the conspiracy count.  In July 2003, the district court granted defendants' motion for acquittal on the ground that the regulations were unconstitutionally vague, <u>Lachman</u>, 278 F. Supp. 2d at 98, but, in October 2004, this court overturned that decision and reinstated the guilty verdicts, subject to the district court's disposition of a yet undecided defense motion for a new trial.  <u>Lachman II</u>, 387 F.3d at 44.

On remand, the district court denied defendants' motion for a new trial, which rested on claims of newly discovered evidence and government non-disclosure of evidence in violation of <u>Brady</u> v. <u>Maryland</u>, 373 U.S. 83 (1963).  Previously, the district court had denied Lachman's separate motion for a new trial on the ground that he was prejudiced by the district court's failure to inquire, under  Fed. R. Crim. P. 44(c)(2), about the potential conflict of interest arising from his joint representation, with the corporate defendants, by a single law firm.

The district court sentenced Lachman to three years of probation, the first year to be served in home detention.  Subilia also received three years of probation, with the first six months to be spent in community confinement followed by one year in home

detention.  Fines of $250,000 were imposed on FMI and each of the individual defendants.  All of the defendants appealed, and the government cross-appealed, challenging the leniency of the sentences.  The government and Subilia thereafter withdrew their appeals.

Now before us are Lachman's claims that the jury's verdict was not supported by sufficient evidence of his scienter and that the district court erred in denying his motion for a new trial based on the alleged Rule 44(c) violation.  In addition, Lachman and the corporate defendants appeal from the denial of their motion for a new trial based on their proffer of newly discovered evidence, including the supposed <u>Brady</u> evidence.  We discuss the sufficiency claim first, then the new evidence and <u>Brady</u> issues and finally the claim based on Rule 44(c).

1.  "The familiar standard that applies to sufficiency-of-the-evidence challenges requires that a [reviewing] court 'determine whether, after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime.'" <u>United States</u> v. <u>Dwinells</u>, 508 F.3d 63, 72 (1st Cir. 2007) (quoting <u>United States</u> v. <u>O'Brien</u>, 14 F.3d 703, 706 (1st Cir. 1994)), <u>petition for cert. filed</u>, No. 07-9462 (Feb. 15, 2008).

Here, the jury was instructed that the government was required to prove two kinds of scienter--both that defendants acted knowingly, i.e., that they knew what was being exported, and that they acted willfully, i.e., that they intended to violate the law (in the sense that they were aware that their conduct was unlawful).[2] Lachman primarily argues that the government failed to introduce sufficient evidence that he knew, in any detail, about the nature of the control panel that was being exported. If he did not know what was being exported, it follows that he could not be guilty of intending to violate the law by exporting the item in question.

The government presented sufficient evidence for a jury to find that Lachman knew that the control panel exported with the 4.9-inch HIP was intended to be used with a HIP having an internal working diameter of five inches or more and that it had the capacity to perform this role. This, as we held in Lachman II, 387 F.3d at 52, would make the control panel one "specially designed" to be used with the larger HIP and therefore one requiring an export license.

---

[2]The government consented to the willfulness element, seemingly in light of the district court's concern about the possible vagueness of the regulations. It now questions whether that concession was proper--the statute provides different penalties for knowing and willful violations, 50 U.S.C. app. § 2410(a), (b), and the indictment charged only knowing violations-- but we need not revisit the instruction issue here.

The evidence is admittedly circumstantial. Lachman did not testify; Subilia (who did) agreed only that he had regular discussions with Lachman, and no witness testified that Lachman had discussed or admitted to knowledge of the precise characteristics of the control panel ultimately exported. But purely circumstantial evidence can support an inference of knowledge, see United States v. Mousli, 511 F.3d 7, 16 (1st Cir. 2007); and here several different elements form a pattern that permitted (even if they did not compel) the jury's inference.

Specifically, in addition to Lachman's overall supervision of the companies' employees, particularly Subilia, the government offered evidence as to Lachman of which the following are examples:

> •that at the start of the project Lachman told the DRDL that he would himself handle the export license requests;
>
> •that Lachman and Subilia talked daily about the project and that Lachman gave Subilia "direction"; and that Lachman "knew what we were doing" via monthly reports from the engineers and the daily conversations with Subilia;
>
> •that Lachman was personally involved in the decision to provide a smaller U.S.-made HIP with an accompanying control panel, the procurement of the components of a larger HIP from third parties in England and Switzerland, and the agreement to send FMI employees to India to connect to the larger HIP the control panel shipped from the United States;
>
> •that Lachman was familiar with the regulation requiring export licenses for large HIPs and

-8-

> control panels specially designed for them;
> and
>
> •that Lachman repeatedly complained about Department of Commerce officials telling him how to run his company and said that he would "get around those sons of bitches" by "get[ting] the parts made wherever I please, and I'll get them shipped to India and I'll get them put together there and our guys will put them together and make it work."

So, although there is no direct evidence that Lachman focused on the special capabilities of the five-zone control panel, the circumstances could persuade a jury that he would almost certainly have known that the panel had been modified to operate the larger HIP and that it was intended to be connected to it. And, while his "getting around" remarks occurred after the control panel itself was shipped, a jury could believe that this spirit animated the transaction of matching the U.S.-made control panel to the foreign-made large-diameter HIP.

The evidence also supports the jury's conclusion, implicit in its verdict, that Lachman intentionally violated the law. The government showed that Lachman was familiar with the export licensing procedure and was aware of the governing regulation. The jury could also infer Lachman's intent from his remarks and from the circuitous mechanisms by which the various components were shipped and assembled to furnish DRDL with a large HIP and compatible control panel. United States v. Malsom, 779 F.2d 1228, 1233-34 (7th Cir. 1985).

The jury was also free to consider that Lachman, as a sophisticated businessman, could easily have sought a ruling from the Department of Commerce and chose not to do so because he expected a negative answer. See Lambert v. California, 355 U.S. 225, 229 (1957); Morissette v. United States, 342 U.S. 246, 276 (1952). In sum, the jury could infer from circumstantial evidence that Lachman was aware that the export of the modified control panel was unlawful. Liparota v. United States, 471 U.S. 419, 433-34 (1985).

Lachman posits other inferences that could be drawn from the same evidence--in particular, that the plan to use the control panel shipped with the smaller HIP to operate the larger HIP evolved over time and resulted from changing independent decisions by the customer rather than from any pre-conceived plan among the defendants. However, when "the record is fairly susceptible of two competing scenarios, the choice between those scenarios ordinarily is for the jury." Dwinells, 508 F.3d at 74. That test is satisfied here.

2. Next, Lachman and the corporate defendants sought a new trial based on evidence that they discovered post-trial, or alternatively, based on the government's failure to disclose exculpatory evidence in violation of its duties under Brady. Both arguments look to overlapping bodies of evidence aimed at showing that officials--including representatives of the government--

-10-

sometimes used the term "specially designed" in a way helpful to a potential good-faith defense for the defendants.

Before trial, the defendants had an affidavit from a former Commerce Department official contending that the quoted phrase was used in certain circumstances to refer to a device that could be used only with the export-restricted item. The defendants chose not to use the witness, arguing instead to the jury, among other things, that the exported control panel was not in fact designed for use with the larger HIP at all. The jury plainly assessed the factual evidence differently.

Over the next several years, the defense unearthed more evidence, presented by post-trial affidavits and accompanying documents, that various United States officials and officials of other countries did sometimes purport to interpret the phrase "specially designed" as if it meant "exclusively usable for" the export-restricted item. Sometimes this was in the context of export restrictions for other items; in certain cases, the officials purported to be talking about the HIP regulation itself.[3] These materials underlie the new trial argument.

---

[3]Perhaps the strongest piece of evidence for defendants is a note from a 1975 COCOM meeting discussing the term "specially designed" as it was used in the regulation of components for gas turbine blades and jet engines. COCOM was the Coordinating Committee on Multinational Export Control based in Paris. The note stated that "[w]hat was meant by 'specially designed' was an equipment used solely for a particular purpose . . . ."

These materials are less impressive than might at first appear. The "exclusive use" language seems to have been aimed primarily at excluding general purpose items that happened to be used with a restricted item--not modified or specially constructed items actually intended to be used with a restricted export. Some of the defense post-trial affiants urging an exclusive use reading then gave the government counter-affidavits making clear that the affiants thought that the exported control panel would have violated the regulation even on their "exclusive use" reading of the regulations.

Of course, however read, the affidavits and supporting materials cannot now alter the legally correct meaning of the regulation governing HIPs. The district court properly ruled, and Lachman II sustained the ruling, that the regulation encompassed a control panel designed specifically for and capable of use with the restricted HIP. But the materials might have been of some use to bolster a good-faith defense based on the exclusive use theory--if one had been properly presented and supported.

Thus, had defendants claimed at trial to have believed in the exclusive use definition when the control panel was exported, this would be a more difficult case; and it would be even more so if they claimed that they had relied on any of the new or allegedly suppressed material. But neither Subilia nor Lachman ever testified that either had relied on the material in question or any

-12-

comparable material.  Indeed, if they had relied upon the materials at the time of the export, the  material could hardly be new or suppressed evidence.

The defendants say that the materials, even though not actually relied upon, increase the likelihood that defendants sincerely believed in the exclusive use definition because the materials supported the view that a "reasonable person" might hold such a belief.  Although the standard is not whether such a belief was reasonable, the more reasonable the belief, the more likely it was sincere.  See United States v. Lussier, 929 F.2d 25, 31 (1st Cir. 1991) (citing Cheek v. United States, 498 U.S. 192, 203-204 (1991)).

But there is no indication that in fact defendants ever held such a contemporaneous belief in an exclusive-use interpretation.  Subilia never made such a claim in his trial testimony, and Lachman did not testify.  Although both now offer post-trial affidavits claiming that they did, they point to no confirming evidence.  Thus the foundation for a good-faith defense based on an exclusive use reading is simply absent.[4]  Defendants

---

[4]United States v. Willie, 941 F.2d 1384, 1393 (10th Cir. 1991) (requiring that proponent of good-faith defense "mak[e] a proffer of great specificity regarding the type of belief he seeks to prove"), cert. denied, 502 U.S. 1106 (1992); Lussier, 929 F.2d at 31 (evidence properly excluded where no connection between proffered evidence and defendant's subjective belief).

-13-

cannot credibly now proffer testimony tailored to fit newly developed evidence.

Because the defendants had available at trial an independent witness to support such an exclusive use interpretation, they had ample reason to press the defense--_if_ they were prepared to say that they had held such a belief at the time they exported the control panel.[5] The fact that the district court would have told the jury that the witness's view was legally mistaken is beside the point: a good faith defense is still good (and only necessary) where the belief was mistaken.

Under these circumstances, the evidence cannot be deemed either exculpatory or impeaching (as required by _Brady_) or as creating a reasonable chance (as also required) that the evidence might have altered the result of the proceedings. _Kyles_ v. _Whitley_, 514 U.S. 419, 434 (1995). _See_ _generally_ _United States_ v. _Sepulveda_, 15 F.3d 1216, 1220 (1st Cir. 1993), _cert. denied_, 512 U.S. 1223 (1994). Nor could the material satisfy the stiffer standard for a new trial based on newly discovered evidence, namely, that it would probably have altered the result. _United_

---

[5]Defendants obtained before trial an affidavit from a former Commerce Department export control specialist stating that in his experience "specially designed" meant "exclusively designed for a controlled product," that while working at Commerce he had provided that definition to numerous exporters, that several Bureau of Export Administration engineers with whom he has spoken--and whom he named in his affidavit--shared this definition, and that he disagreed with the definition put forth by two Commerce officials on behalf of the government.

-14-

States v. Conley, 249 F.3d 38, 45 (1st Cir. 2001); United States v. Wright, 625 F.2d 1017, 1019 (1st Cir. 1980).

We thus need not decide whether--if the defendants had mounted a good-faith defense based on exclusive use--a court would have been likely to admit the new evidence in support.  The government says the evidence would not be admissible, but case law may well leave this up to the trial judge based on the usual considerations.  Still, it is much weaker evidence than materials actually relied upon to support a belief, and in this case there is no plausible evidence that the belief was ever held by the defendants.

This conclusion also makes it unnecessary to examine Brady's other prong, namely, wrongful suppression.  Defendants' Brady claim rests largely on notes and minutes of meetings of COCOM, the multinational working group based in Paris.  See note 3, above.  How much of the material may have found its way into Commerce Department files is unclear and what kind of search of such files was required is also debatable, see United States v. Brooks, 966 F.2d 1500, 1503-04 (D.C. Cir. 1992), but in the absence of prejudice it simply does not matter.

3.  Last, Lachman seeks a new trial on the ground that his trial counsel--who jointly represented him and the corporate defendants (but not Subilia)--operated under a conflict of interest, thereby denying Lachman the effective assistance of

counsel guaranteed by the Sixth Amendment. Wood v. Georgia, 450 U.S. 261, 271 (1981). The government replies that Lachman's counsel informed him of the risks of joint representation and that he knowingly acceded to the joint representation; further, it argues that in any event, there was no actual conflict between his defense strategy and that of the corporate defendants. The former argument is debatable; the latter beyond dispute.

One might think that Lachman's choice of counsel was his own affair; but ordinarily in cases of joint representation a district court must "inquire about the propriety of joint representation and must personally advise each defendant of the right to the effective assistance of counsel, including separate representation." Fed. R. Crim. P. 44(c)(2); see also United States v. Foster, 469 F.2d 1, 4-5 (1st Cir. 1972). Here, a magistrate judge warned defendants' counsel at a pre-trial conference of the need for a Rule 44(c) hearing. For whatever reason, the district court never engaged in the required colloquy.

However, the district court's failure to conduct a proper Rule 44(c) inquiry does not automatically entitle Lachman to a new trial. United States v. Nelson-Rodriguez, 319 F.3d 12, 41-42 (1st Cir.), cert. denied sub nom. Caribe-Garcia v. United States, 539 U.S. 928 (2003). Lachman can prevail only if there was a plausible alternative defense strategy that was either foreclosed or inhibited by the joint representation. Id.; accord United States

v. Ramirez-Benitez, 292 F.3d 22, 30 (1st Cir. 2002).[6]  Once that condition can be shown, prejudice is presumed, and a defendant need not show that the alternative strategy would necessarily have affected the outcome at trial.  Mickens v. Taylor, 535 U.S. 162, 172-73 (2002); Nelson-Rodriquez, 319 F.3d at 42.

Lachman has not made the requisite proffer.  He contends that his counsel focused on a theory that would exonerate all the defendants--i.e., that the export at issue did not violate the regulations as understood by the defendants--and neglected Lachman's alternative position, which was that as president he set general policy and was not familiar with the details of this rather small transaction.  But the two theories are not inconsistent, and a review of the record demonstrates that joint counsel could and in fact did pursue both theories.

Lachman was president, chairman and virtually the sole owner (96 percent) of the corporate defendants.  His attorneys testified in post-trial depositions that he hired them and directed defense strategy.  When they discussed with him the possibility of conflicts emerging, he rejected the notion of separate counsel.

---

[6]In Foster, 469 F.2d at 5, this court held that where a district court fails properly to inquire, the burden is on the government to prove the absence of such a conflict. More recently, in Nelson-Rodriquez, 319 F.3d at 42, we reserved judgment as to whether Foster's burden shifting approach was overturned by Mickens v. Taylor, 535 U.S. 162, 173-74 (2002).  However this may be, a defendant raising a conflict claim must put forth a colorable theory of how he was prejudiced by joint representation before the government might be expected to respond to it.

Whether or not his discussions with counsel amounted to "the most complete and effective out-of-court advice," Lachman was a sophisticated businessman who "was not totally lacking in some advance warning of the pitfalls of joint representation." United States v. Martorano, 620 F.2d 912, 915 n.3 (1st Cir.), cert. denied, 449 U.S. 952 (1980).

In any event, Lachman's effort to distance himself personally from the transaction would not undermine the common defense strategy of defending the propriety of the transaction. Without casting aspersions on the legality of the export of the control panel, Lachman's counsel could, and did, argue both that the export of the control panel was lawful and also that Lachman had no reason to be and in fact was not familiar with the details of the transaction.

In a motion for judgment of acquittal at the close of the government's case-in-chief and again during closing arguments before the jury, counsel argued that "[t]here is no evidence that he [Lachman] knew anything whatsoever regarding the nature or design or capabilities of the control panel," and "no evidence that Walt Lachman was involved in the building of this control panel." Counsel also cross-examined the corporate employees who testified for the government, seeking to undermine any testimony that the government had elicited connecting Lachman to this transaction. In short, joint counsel in fact pursued the very "alternative"

strategy Lachman now argues was impaired or foreclosed by the joint representation.

Lachman's motion for a new trial was supported by an affidavit of an expert in trial practice and legal ethics that supports the view that a distancing argument could undermine a claim of lawfulness. Indeed, the affidavit asserts ambitiously that a defense (for the corporation) that the export was lawful is "factually inconsistent enough" with a defense of lack of knowledge (by Lachman) "so that a single lawyer could not pursue them both vigorously and without reservation." But the two defenses are not inconsistent: one turns on the interpretation of the law, the other on Lachman's awareness of the control panel's capacity and intended use.

A claim of tension between defenses might well be colorable on some facts, but such a tension has not been shown here. Nor does the affidavit confront the fact that joint counsel did press Lachman's "alternative" defense of lack of knowledge as well as the legal defense. This case is not one in which a junior executive is sacrificed for the company; on the contrary, Lachman effectively controlled the defense and sensibly chose to present both defenses--either of which could have succeeded in exculpating him, but neither of which did.

Affirmed.