# United States Court of Appeals
## For the First Circuit

No. 15-1065

UNITED STATES OF AMERICA,

Appellee,

v.

JOSE D. CARDONA-VICENTY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Lynch, Thompson, and Kayatta,
Circuit Judges.

Jose Luis Novas-Debien, III for appellant.
Julia Meconiates, Assistant United States Attorney, with whom Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, Francisco A. Besosa-Martínez, Assistant United States Attorney, and Rosa Emilia Rodríguez-Vélez, United States Attorney were on brief, for appellee.

December 2, 2016

**THOMPSON**, **Circuit Judge**. Jose D. Cardona-Vicenty ("Cardona") pled guilty to conspiring to distribute narcotics near three public housing projects and possessing a firearm in furtherance of the drug trafficking offense. After accusing his first lawyer of coercing him into accepting a plea agreement, Cardona was appointed new counsel for sentencing purposes. On appeal, Cardona argues that the district court's assignment of new counsel, who also represented a co-defendant in the drug trafficking conspiracy, resulted in a conflict of interest for counsel number two. He also claims that the district court erred in failing to hold a Foster hearing to address the purported conflict. Cardona insists that these errors require us to vacate his sentence and remand the case for resentencing with new counsel. But because there was no clear error with the sentencing court's fact finding and no actual conflict of interest, we affirm the sentence imposed below.

## Background[1]

On April 23, 2014, Cardona was indicted, along with forty-seven co-defendants, for his involvement in a drug trafficking conspiracy which operated out of three public housing

---

[1] As this sentencing appeal follows a guilty plea, "we glean the relevant facts from the change-of-plea colloquy, the unchallenged portions of the presentence investigation report ('PSI Report'), and the record of the [relevant] disposition hearing[s]." United States v. Vargas, 560 F.3d 45, 47 (1st Cir. 2009).

- 2 -

projects in Mayagüez, Puerto Rico.  Several months later, Cardona pled guilty to Counts One and Six of the indictment pursuant to a Plea Agreement (the "Agreement").  Count One charged him with conspiring to possess with the intent to distribute various amounts of heroin, cocaine, crack cocaine, and marijuana within a thousand feet of the three public housing projects, in violation of 21 U.S.C. §§ 841(a)(1), 860, and 846.  Count Six charged him with carrying and using a firearm in relation to the drug trafficking offense, in violation of 18 U.S.C. §§ 924(c)(1)(A) and (2).  The remaining charges against him (Counts Two through Five) were dismissed pursuant to the Agreement.

By the terms of the Agreement, the parties agreed to calculate Cardona's total offense level at 33, but made no stipulation as to Cardona's Criminal History Category.[2]  The parties agreed to recommend a sentence at the lower end of the Sentencing Guidelines (the "Guidelines") range for the possession count and the mandatory minimum of five years for the firearm charge.  Additionally, Cardona agreed to waive his right to appeal the judgment and sentence if sentenced in accordance with the terms and conditions of the Agreement.  And the government agreed that

---

[2] The offense level at 33 was based on the following:  a base offense level of 34 under USSG §§ 2D1.1(c)(4) and 2D1.2(a)(1); plus 2 levels under USSG § 3B1.1(c) for his role as a leader, organizer, manager, or supervisor in the drug organization; minus 3 levels for acceptance of responsibility.

it would not seek any further adjustments to or departures from Cardona's offense level outside of the enhancements already applied.

On August 27, 2014 (20 days after Cardona's change of plea, but before sentencing), Cardona's attorney at the time, Peter Diaz-Santiago ("Diaz"), moved to withdraw because Cardona had accused Diaz -- falsely, in Diaz's opinion -- of coercing him into pleading guilty. In response to Diaz's motion, the district court set a hearing date -- September 15, 2014 -- to learn the details surrounding Cardona's claims and Diaz's desire to withdraw. The district court requested that Miguel Oppenheimer ("Oppenheimer"), an attorney for one of Cardona's drug trafficking co-defendants, attend the hearing "to assist if need be."

At the proceeding, Cardona sought to withdraw his guilty plea. As per the court's instruction, Oppenheimer interviewed Cardona and Diaz to better understand the circumstances surrounding Cardona's attempts to withdraw his plea and Diaz's request to withdraw as defense counsel. After meeting with both Cardona and Diaz, Oppenheimer summarized their respective positions for the court and then questioned both individuals under oath. Cardona testified that he felt pressured to either accept the plea deal or go to trial and receive a life sentence if convicted. On the other hand, Diaz stated that he met with Cardona on multiple occasions to discuss the charges against him, denied

Cardona's allegations of coercion, and stated that although Cardona was unhappy with the amount of time offered in the Agreement, Cardona still chose to plead guilty and never indicated that he was hesitant to accept the plea or that he did not want to sign the Agreement. Rounding out the dispute, the government argued that Cardona's request to withdraw his plea should be denied because he was essentially attempting to re-negotiate his plea deal -- as the government saw it, he still wanted to plead guilty; he just wanted a better deal.

After hearing from Cardona, Diaz, and the government, the district court denied Cardona's request to withdraw his guilty plea, finding his allegations against his attorney to be "totally frivolous" and ultimately granted Diaz's request to withdraw, assigning Oppenheimer as Cardona's new counsel for sentencing purposes. Upon Oppenheimer's appointment, the government vocalized concerns regarding a potential conflict of interest arising from a murder that Cardona had allegedly ordered from jail that was ultimately executed by a co-defendant who was also represented by Oppenheimer. The government opined that this might cause a conflict because Oppenheimer "might want to argue one way for one defendant and another way for another defendant" and accordingly remarked that a Foster hearing[3] might be necessary.

---

[3] A Foster hearing requires a trial court

However, the court did not believe that an actual conflict existed, noting that neither the Agreement nor any facts included in the Agreement contained anything regarding the alluded-to murder and that the murder was not at issue in Cardona's case.

In any event, Oppenheimer advised the court that he would check with Cardona's co-defendant to ensure that there were no potential conflicts and he would let the court know if a Foster hearing was necessary. Oppenheimer never informed the court of any conflict and proceeded to represent Cardona for sentencing purposes. On December 7, 2014, after Cardona's co-defendant had already been sentenced for his role in the drug trafficking conspiracy pursuant to his own plea agreement and two days before Cardona's sentencing hearing, Oppenheimer filed a sentencing memorandum reiterating, among other things, Cardona's wish to recant his guilty plea.

On the day of the hearing, Cardona pressed his contention that he was coerced into pleading guilty. But after hearing

---

> [T]o comment on some of the risks confronted where defendants are jointly represented to insure that defendants are aware of such risks, and to inquire diligently whether they have discussed the risks with their attorney, and whether they understand that they may retain separate counsel, or if qualified, may have such counsel appointed by the court and paid for by the government.

United States v. Foster, 469 F.2d 1, 5 (1st Cir. 1972).

Cardona's reiterated plaint, the court reminded Cardona that it had already denied his request to withdraw his plea and would not reconsider its decision.

After the court reaffirmed its ruling, the government, concerned about Cardona's continued attempts to withdraw his guilty plea, decided to introduce evidence of Cardona's role as a leader and his use of a firearm in furtherance of the conspiracy.[4] The court then accepted probation's recommendation of an applicable Criminal History Category of III (rejecting Cardona's push for a lower one) and determined the appropriate offense level was 34 rather than 33, resulting in a Guidelines range of 188-235 months for Count One.[5] Nonetheless, consistent with the plea

---

[4] Although the government introduced evidence of Cardona's role as a leader and his use of a firearm in furtherance of the conspiracy at sentencing, this was only in response to Cardona's continued attempts to withdraw his guilty plea. The government made clear that it did not intend to violate the Agreement and only sought to introduce the evidence "to show [that Cardona] indeed possessed firearms and was a leader," contrary to his plea withdrawal assertions. The government never asked the court to find Cardona in breach of the Agreement. Indeed, at sentencing, the government recommended an offense level and sentence in accordance with the terms of the Agreement and did not argue for any additional enhancements that were not provided for in the Agreement. The sentencing judge also noted before allowing the government to introduce the evidence that it was "not a violation of the Plea Agreement" to do so.

[5] Cardona was sentenced on December 9, 2014. USSG Amendment 782 became effective on November 1, 2014, after the plea agreement was entered. Amendment 782 permits a retroactive, two-level reduction of the base offense levels for drug offenders sentenced pursuant to USSG §§ 2D1.1 and 2D1.11. See USSG App. C. Supp., Amend. 782. Applying the new base offense level under Amendment 782, the court adopted probation's recommendation,

- 7 -

agreement, the government recommended a sentence of 168 months for Count One and the mandatory minimum of 60 months for Count Six.

Rejecting this recommendation as inadequate, the court sentenced Cardona to a below-Guidelines sentence of 180 months on Count One and 60 months on Count Six, to be served consecutively.

This timely appeal followed.[6]

**Discussion**

Cardona contends that the district court denied him his constitutional right to the effective assistance of counsel because the court failed to hold a <u>Foster</u> hearing and Oppenheimer labored under a conflict of interest.[7]  The government argues that the failure to hold a <u>Foster</u> hearing resulted in no reversible error because there was no actual conflict of interest.  "Where an

_____

started with a base offense level of 32, and added 2 levels for Cardona's role as a leader pursuant to USSG § 3B1.1(c).  The court then calculated Cardona's total offense level at 34, declined to award Cardona credit for acceptance of responsibility because of his ongoing efforts to withdraw his plea, and declined to add any additional enhancements.

[6] The government argues that Cardona's claims are precluded by the waiver-of-appeal clause of the Agreement. Cardona's claims can easily be resolved on the merits.  Therefore, "[f]or ease in analysis," we "assume arguendo that the waiver-of-appeal provision does not bar the maintenance of this appeal." <u>United States</u> v. <u>Dávila-Tapia</u>, 491 F. App'x 197, 198 (1st Cir. 2012).

[7] Cardona does not challenge the appropriateness of the court's decision to appoint Oppenheimer as his lawyer after utilizing Oppenheimer as a type of independent counsel or investigator for the court to address Diaz's motion to withdraw and Cardona's claims of coercion.  We do not consider the appropriateness of that practice here because Cardona does not raise this argument on appeal.

ineffective assistance [of counsel] claim is premised on counsel's alleged conflict of interest, we review the ultimate issue de novo, but defer to the district court's subsidiary fact findings unless they are clearly erroneous." Reyes-Vejerano v. United States, 276 F.3d 94, 97 (1st Cir. 2002) (citing Familia-Consoro v. United States, 160 F.3d 761, 764-65 (1st Cir. 1998)).

Under the Sixth Amendment, "a defendant has a right to conflict-free representation." United States v. Hernandez-Lebron, 23 F.3d 600, 603 (1st Cir. 1994). A lawyer can represent multiple defendants, but not if the joint representation "gives rise to a conflict of interests adversely affecting the lawyer's performance" -- for then there would be a Sixth Amendment violation. Id.

And given the "ubiquitous and insidious" risks of multiple representation, the Sixth Amendment imposes a duty on trial courts to investigate a defendant's timely objections to joint representation and to inquire into the propriety of multiple representation whenever the trial court "knows or reasonably should know that a particular conflict exists." Id. at 603-04. "Federal Rule of Criminal Procedure 44(c) expands these duties by requiring an inquiry into the possibility of a conflict in all cases where jointly-charged defendants retain the same counsel." Id. at 604. Specifically, under Rule 44(c), "[u]nless there is good cause to believe that no conflict of interest is likely to

arise," the court is required to "take appropriate measures to protect each defendant's right to counsel." Fed. R. Crim. P. 44(c). Rule 44(c) requires a "district court [to] inquire into each instance of joint representation of multiple defendants, and [requires the court to] advise each defendant of his right to separate counsel." United States v. Coneo-Guerrero, 148 F.3d 44, 47 (1st Cir. 1998). The timing and form of this inquiry is left to the discretion of the court. See Foster, 469 F.2d at 5.

"If a satisfactory inquiry does not appear on the record, the government has the burden of persuasion of demonstrating that prejudice to the defendant was improbable." United States v. Mazzaferro, 865 F.2d 450, 454 (1st Cir. 1989) (citing Foster, 469 F.2d at 5). If a satisfactory inquiry was held, the defendant "bears the burden of persuasion that he was deprived of a fair trial resulting from a conflict of interest arising from the joint representation." Id.

Here, no Foster inquiry was held. However, even if we assume that a Foster inquiry was required, the government has sufficiently demonstrated that any prejudice to Cardona was improbable because there was no actual conflict of interest.[8]

---

[8] While we ultimately find that there was no conflict of interest here, given the "ubiquitous and insidious" risks of multiple representation discussed earlier, we caution that courts -- in order to avoid any risk of impropriety -- should give more express attention than was afforded here when making attorney appointments which result in dual representation of co-defendants.

- 10 -

As mentioned above, the joint representation of co-defendants does not in itself constitute a per se violation of the Sixth Amendment right to conflict-free representation. See Burger v. Kemp, 483 U.S. 776, 783 (1987); Cuyler v. Sullivan, 446 U.S. 335, 348 (1980)(holding that "multiple representation does not violate the Sixth Amendment unless it gives rise to a conflict of interest" and "a reviewing court cannot presume that the possibility for conflict has resulted in ineffective assistance of counsel"). Indeed, "[t]he Sixth Amendment right to effective assistance of counsel is violated when an actual conflict of interest adversely affects counsel's representation." Bucuvalas v. United States, 98 F.3d 652, 656 (1st Cir. 1996) (citing Cuyler, 446 U.S. at 348). And "[a] defendant 'who raised no objection at trial [or at the district court below] must demonstrate that an actual conflict of interest adversely affected his lawyer's performance.'" Familia-Consoro v. United States, 160 F.3d 761, 764 (1st Cir. 1998) (citing Cuyler, 446 U.S. at 349-50)). To establish an actual conflict of interest, a "defendant must show that (1) the attorney could have pursued a plausible alternative defense strategy, and (2) the alternative strategy was inherently in conflict with or not undertaken due to the attorney's other interests or loyalties." Id. (citing United States v. Soldevila-Lopez, 17 F.3d 480, 486 (1st Cir. 1994)). In other words, Cardona "can prevail only if there was a plausible alternative defense

- 11 -

strategy that was either foreclosed or inhibited by the joint representation." United States v. Lachman, 521 F.3d 12, 21 (1st Cir. 2008) (citing United States v. Nelson-Rodriguez, 319 F.3d 12, 41-42 (1st Cir.), cert. denied sub nom. Caribe-Garcia v. United States, 539 U.S. 928 (2003)). If Cardona can demonstrate that some plausible alternative defense strategy or tactic might have been pursued, "[h]e need not show that the defense would necessarily have been successful if it had been used, but merely that it possessed sufficient substance to be a viable alternative." Brien v. United States, 695 F.2d 10, 15 (1st Cir. 1982) (citing Foxworth v. Wainwright, 516 F.2d 1072, 1079 (5th Cir. 1975)).

But speculative or theoretical conflicts of interests do not amount to a Sixth Amendment violation. See Soldevila-Lopez, 17 F.3d at 487 (finding appellant's claim of a conflict of interest to be based on "mere speculation" and holding that "[a] theoretical or merely speculative conflict of interest will not invoke the per se rule") (citing United States v. Aeillo, 900 F.2d 528, 530–31 (2d Cir. 1990)); Brien, 695 F.2d at 15 (holding that "the tactics [the appellant] suggests that his attorney could have pursued appear to be merely hypothetical choices that in reality could not have benefited [the appellant] and were often not in any conflict with [his attorney's] other loyalties"); Cuyler, 446 U.S. at 350 (noting that the mere possibility of a conflict is not sufficient to establish a violation of a defendant's right to conflict-free

- 12 -

representation and that a defendant must "show[] that his counsel actively represented conflicting interests" in order to establish an actual conflict).

Cardona begins by conjuring up three hypothetical situations which he contends could have given rise to a conflict of interest. First, he theorizes that if the government had sought to nullify the plea agreement given his perceived "breach" (presumably based on his attempts to withdraw his guilty plea), this may have resulted in a trial where he might have had to defend against murder allegations. Second, he suggests that if the court had allowed him to withdraw his guilty plea, and if he had then chosen to plead guilty without a plea agreement, he may have had to defend against a cross reference guideline for the murder pursuant to USSG § 2A1.1. And third, he hypothesizes that even if his plea agreement remained intact, he may have had to defend against a § 2A1.1 cross reference at the recommendation of probation.

But even Cardona concedes that the would-be conflicts he complains of "did not materialize." The government never moved to find Cardona in breach of his plea agreement (despite his continued attempts to withdraw his guilty plea), and the court repeatedly denied Cardona's multiple attempts to withdraw his plea (a ruling he does not contest on appeal). And with that plea agreement impermeable below, Cardona never faced trial and he never, under

any other contrivance he imagines, had to defend against a USSG §

2A1.1 cross reference guideline for murder. Because none of the

hypothetical situations he outlines actually occurred, there was

no opportunity for his attorney at the time to pursue any

"plausible alternative defense strategy that was either foreclosed

or inhibited by [Oppenheimer's] joint representation."[9] Lachman,

521 F.3d at 21.[10]

As "[w]e [have] long ago cautioned," where the conflict

relies on "some attenuated hypothesis having little consequence to

the adequacy of representation," Brien, 695 F.2d at 15, we will

not grant an "undeserved 'windfall' to defendants by

[automatically] vacating convictions." Nelson-Rodriguez, 319 F.3d

at 42 (citations omitted); see also United States v. Newton, 326

F.3d 253, 263-64 (1st Cir. 2003) (rejecting a rule of "automatic

---

[9] For each hypothetical scenario, Cardona seems to allege that but for the purported conflict, his attorney could have pursued alternative defense strategies: (1) the cross examination of witnesses regarding his supposed participation in a murder; and (2) the possibility of him or his co-defendant deciding to cooperate and implicate the other at trial. Because we find no conflict we need say no more.

[10] Ever persistent, Cardona insists that the government's statement after Oppenheimer was appointed -- that Oppenheimer "might want to argue one way for one defendant and another way for another defendant" -- satisfies his burden of "showing an alternative defense strategy, which might bear negatively on the defense of the other client" and sufficiently establishes an actual conflict. Cardona's argument that the government's statement somehow amounts to a defense strategy is nonsensical. Nor does the government's statement amount to an actual conflict of interest: at best, the government pointed out a potential conflict that was never actualized given both co-defendants' guilty pleas.

- 14 -

reversal in cases where a defense attorney's conflict of interest does not adversely affect counsel's performance, observing that such a rule 'makes little policy sense'") (quoting Mickens v. Taylor, 535 U.S. 162, 172 (2002)).  That is so because the Sixth Amendment right to effective assistance of counsel has been accorded "not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial."  Mickens, 535 U.S. at 166 (quoting United States v. Cronic, 466 U.S. 648, 658 (1984)).  Where there is no conflict of interest and thus no effect on counsel's representation or a defendant's fair trial interests, there is no Sixth Amendment violation.  See Newton, 326 F.3d at 263-64.

## CONCLUSION

For the foregoing reasons, we affirm the sentence of the court below.